WILSON ET AL., APPELLEES, *v.* BRUSH WELLMAN, INC., APPELLANT.

[Cite as *Wilson v. Brush Wellman, Inc.,*
103 Ohio St.3d 538, 2004-Ohio-5847.]

(No. 2003–0048—Submitted December 16, 2003—Decided November 17, 2004.)

O'CONNOR, J.

{¶ 1} We are asked to consider whether class certification under Civ.R. 23(B)(2) is proper in an action seeking to establish a medical-monitoring fund. Although under the proper circumstances court-ordered medical monitoring may be classified as injunctive relief, we hold that plaintiffs in this action fail to meet the cohesiveness requirement of the rule.

## I. Facts and Procedural History

{¶ 2} Appellees-plaintiffs are members of unions within the Northwestern Ohio Building and Construction Trades Council. Plaintiffs were all employed at various times by contractors at the Brush Wellman Elmore plant from the 1950s through the 1990s. The Brush Wellman Elmore plant produces beryllium alloy for use in industrial applications. Plaintiffs allege that they were exposed to beryllium dust and fumes that were generated by manufacture of the alloy. Beryllium exposure can cause a lung ailment called chronic beryllium disease and other ailments. Some individuals may never show symptoms or develop any disease, while others can have serious impairments or even die as a result of their exposure.

{¶ 3} On February 14, 2000, John Wilson and six other union members filed a claim against appellant-defendant Brush Wellman, Inc., alleging negligence, strict liability in tort, statutory product liability, and engagement in ultrahazardous activities. Specifically within the negligence claim, plaintiffs alleged that Brush Wellman had failed to properly control and contain the beryllium, failed to train plaintiffs and proposed class members, failed to provide a safe place of employment, failed to monitor working conditions, and failed to warn plaintiffs and proposed class members of the dangers of beryllium. The complaint sought a medical-screening program to detect beryllium sensitivity as well as punitive damages.

{¶ 4} Plaintiffs moved the trial court to certify a class that would include all Northwestern Ohio Building and Construction Trades Council union members who worked at the Elmore plant from 1953 through December 31, 1999. After a hearing, the trial court held that although the proposed class met the requirements under Civ.R. 23(A),[1] it failed to satisfy any of the requirements of Civ.R. 23(B).

---

1. Civ.R. 23(A) specifies four prerequisites to class actions: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the

{¶ 5} The trial court examined all three requirements of Civ.R. 23(B), finding that plaintiffs' claims failed each. In reaching its decision, the court quoted our decision in *Warner v. Waste Mgt., Inc.* (1988), 36 Ohio St.3d 91, 95, 521 N.E.2d 1091: "Subsection (B)(1)(a) does not lend itself to mass tort claims, such as the one before us. Pursuant to this subsection, certification is permissible if separate actions could lead to incompatible standards of *conduct.*" (Emphasis sic.) The court concluded that differing standards of conduct were not likely to appear in this case if separate actions were pursued.

{¶ 6} The trial court held that Civ.R. 23(B)(2) certification was inappropriate because that subsection does not apply when the class is primarily seeking damages. Civ.R. 23(B)(2) applies when the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. The court relied upon *Day v. NLO, Inc.* (S.D.Ohio 1992), 144 F.R.D. 330, in holding that medical-monitoring damages, in addition to the punitive damages sought, do not constitute injunctive relief. The court noted that plaintiffs did not characterize their claim for medical monitoring as injunctive relief.

{¶ 7} The trial court went on to recognize that Civ.R. 23(B)(2) requires a showing that Brush Wellman acted or refused to act with respect to the *class as a whole,* commonly referred to as a cohesiveness requirement. The court found that there were disparate factual circumstances in the class that precluded certification.

{¶ 8} Plaintiffs also failed to satisfy Civ.R. 23(B)(3), according to the trial court. The court held that "individual questions in this case not only outnumber, but most importantly, outweigh any questions that are common to the class." Having determined that plaintiffs failed to meet the requirements of Civ.R. 23(B), the court denied class certification.

{¶ 9} Plaintiffs appealed the denial of class certification. The appellate court, which considered certification under Civ.R. 23(B)(2) exclusively, held that "the trial court erred by finding this criteri[on] absent." The court reasoned that because plaintiffs primarily sought medical surveillance and screening, which it determined were injunctive in nature, certification under Civ.R. 23(B)(2) was appropriate. The court held that the request for damages was incidental to the request for medical monitoring. The court failed to examine the cohesiveness of the suggested class.

---

claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Two other requirements are implicit: The class must be identifiable and the representatives must be members of the class. *Warner v. Waste Mgt., Inc.* (1988), 36 Ohio St.3d 91, 96, 521 N.E.2d 1091.

{¶ 10} The cause is now before this court pursuant to our acceptance of Brush Wellman's discretionary appeal.

## II. Analysis

{¶ 11} The trial court's determination that plaintiffs met the requirements of Civ.R. 23(A) was not challenged on appeal. Accordingly, the issue before us is whether the appellate court properly reversed the trial court's finding that the requirements of Civ.R. 23(B) were not met. As we have previously stated, "while a trial court's determination concerning class certification is subject to appellate review on an abuse-of-discretion standard, due deference must be given to the trial court's decision. * * * A finding of abuse of discretion, particularly if the trial court has refused to certify, should be made cautiously." *Marks v. C.P. Chem. Co.* (1987), 31 Ohio St.3d 200, 201, 31 OBR 398, 509 N.E.2d 1249.

{¶ 12} The appellate court, although it correctly described its charge under an abuse-of-discretion analysis, did not follow through with such an analysis. Rather than analyzing whether the trial court's decision was "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias," *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256–257, 662 N.E.2d 1, the appellate court held merely that the trial court "erred." As this court is charged with considering issues of "public or great general interest,"[2] we do not reverse this case solely on the appellate court's error but will also examine the propriety of the court's underlying legal analysis.

{¶ 13} In reversing the trial court, the appellate court focused its attention solely on Civ.R. 23(B)(2), which states that class actions may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This rule entails two requirements: (1) the action must seek primarily injunctive relief, and (2) the class must be cohesive.

### A. Medical Monitoring as Injunctive Relief

{¶ 14} The first step in this inquiry is to determine whether the relief sought by plaintiffs is injunctive in nature. Our analysis begins with plaintiffs' motion for class certification. The memorandum in support of the motion discussed at length the appropriateness of class certification under Civ.R. 23(B)(1)(a) and 23(B)(3). The motion briefly discusses Civ.R. 23(B)(2) as an alternative avenue of certification. The plaintiffs, however, stated, "Plaintiffs do not believe that their

---

2. Section 2(B)(2)(e), Article IV, Ohio Constitution.

claim for medical monitoring is one for injunctive relief. Rather, Plaintiffs believe that their claim is one for damages, to recover the costs of adopting and implementing a medical surveillance program. However, if the Court decides to treat Plaintiffs' claim as one injunctive relief [sic], then class certification under Ohio Rule of Civil Procedure 23(b)(2) would be appropriate." The trial court relied heavily, and not inappropriately, upon the plaintiffs' own characterization of their claim.

{¶ 15} Conversely, the appellate court considered it an error for the trial court to have held that class certification was inappropriate under Civ.R. 23(B)(2).[3] The appellate court acknowledged that there is discordance among the courts, federal and state, on whether medical-monitoring relief is primarily compensatory or injunctive, yet decided this case without meaningful examination of such cases. Moreover, Ohio case law provides scant guidance for this question.

{¶ 16} In *Marks v. C.P. Chem. Co.*, class certification was denied for individuals who had had foam insulation with toxic formaldehyde levels sprayed into their homes. The plaintiffs sought future diagnostic testing for class members in addition to damages. We declined to certify the class under Civ.R. 23(B)(2) because the "provision is inapplicable where the primary relief requested is damages." *Marks*, 31 Ohio St.3d at 203, 31 OBR 398, 509 N.E.2d 1249. *Marks* is not dispositive of this case, however, as it is not clear from the opinion whether we characterized diagnostic testing as damages or whether we merely referred to other damages sought by the plaintiffs.

{¶ 17} More thorough guidance is provided from the federal courts, which have considered this issue on multiple occasions.[4] *Zinser v. Accufix Research Inst., Inc.* (C.A.9, 2001), 253 F.3d 1180, provides a helpful recitation of the ways in which these cases have been decided. Certification under Civ.R. 23(B)(2) depends upon what type of relief is primarily sought, so where the injunctive relief is merely incidental to the primary claim for money damages, Civ.R. 23(B)(2) certification is inappropriate. The *Zinser* court stated, "Courts have split on whether medical monitoring relief is primarily compensatory or injunctive. Depending on the nature of the precise relief sought and the circumstances of the particular case, many courts have declined to certify medical monitoring classes when joined with requests for funding and compensation." Id. at 1196.

---

3. It is puzzling how there could be an abuse of discretion by a trial court when the judge, in holding against plaintiffs, relies specifically upon the plaintiffs' stance on the nature of their claim. As we have stated above, however, the appellate court did not properly engage in an abuse-of-discretion analysis.

4. Fed.R.Civ.P. 23(a), (b), and (c) are identical to their counterparts in the Ohio rule. As we have previously recognized, "federal authority is an appropriate aid to interpretation of the Ohio rule." *Marks v. C.P. Chem. Co.*, 31 Ohio St.3d at 201, 31 OBR 398, 509 N.E.2d 1249.

{¶ 18} The court went on to cite several decisions that declined to certify medical-monitoring classes for various reasons. *Boughton v. Cotter Corp.* (C.A.10, 1995), 65 F.3d 823, 827 (relief sought was primarily money damages); *Cook v. Rockwell Internatl. Corp.* (D.Colo.1998), 181 F.R.D. 473, 479–480 (even where relief sought was diagnostic testing and medical screening necessary to facilitate early detection and treatment, because of other relief sought, the suit was primarily one for damages); *Arch v. Am. Tobacco Co.* (E.D.Pa.1997), 175 F.R.D. 469, 483–485 (plaintiffs' medical-monitoring program included a fund for treatment, which "drastically alters the nature of the relief requested by plaintiffs," making it basically a traditional damage claim for personal injury); *O'Connor v. Boeing N. Am., Inc.* (C.D.Cal.1997), 180 F.R.D. 359, 378–379 (plaintiffs sought establishment of a reserve fund to pay for the cost of the medical-monitoring program, which included medical treatment of disease, as opposed to a court-established medical-monitoring program solely for the purposes of diagnosing disease and sharing information with class members).

{¶ 19} Recognizing the multitudinous variations that these claims may take, the United States District Court for the Southern District of Ohio demarcated injunctive versus compensatory relief as follows:

{¶ 20} "Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief constitute[s] injunctive relief as required by rule 23(b)(2).

{¶ 21} "However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstances, the relief constitutes injunctive relief as required by rule 23(b)(2)." *Day v. NLO, Inc.*, 144 F.R.D. at 335–336.

{¶ 22} Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive. It has the added advantage of being a bright-line test, which can be readily and consistently applied. We hereby adopt that guideline for making such determinations.

{¶ 23} Plaintiffs in this action seek an order for Brush Wellman to "pay for a reasonable medical surveillance and screening program," punitive damages in

excess of $25,000, and "[i]nterest, costs, attorney fees and such other and further relief as the Court may deem just and proper." Although plaintiffs' merit briefs before this court state that the class sought court-supervised medical monitoring, we can find no such requests in the record below. The trial court did not abuse its discretion by concluding that plaintiffs' complaint primarily sought damages. Although a request for court supervision could be easily added by an amended complaint, plaintiffs' lack of cohesiveness is fatal.

### B. Cohesiveness

{¶ 24} Plaintiffs' class certification under Civ.R. 23(B)(2) fails for lack of cohesiveness. Although this court has not had an opportunity to address the cohesiveness requirement of Civ.R. 23(B)(2) class certification, there are myriad federal cases providing us guidance. *Barnes v. Am. Tobacco Co.* (C.A.3, 1998), 161 F.3d 127, 142–143, held, "[T]he cohesiveness requirement enunciated by both this court and the Supreme Court extends beyond Rule 23(b)(3) class actions. Indeed, a (b)(2) class may require more cohesiveness than a (b)(3) class. This is so because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out."

{¶ 25} The United States Supreme Court, discussing the (b)(3) predominance requirement, stated:

{¶ 26} "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. * * * Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revision of Rule 23, it is true, noted that 'mass accident' cases are likely to present 'significant questions, not only of damages but of liability and defenses of liability, * * * affecting the individuals in different ways.' Adv. Comm. Notes, 28 U.S.C.App. p. 697. And the Committee advised that such cases are 'ordinarily not appropriate' for class treatment. *Ibid.* But the text of the Rule does not categorically exclude mass tort cases from class certification * * *. The Committee's warning, however, continues to call for caution when individual stakes are high and disparities among class members great. As the Third Circuit's opinion makes plain, the certification in this case does not follow the counsel of caution. That certification cannot be upheld, for it rests on a conception of Rule 23(b)(3)'s predominance requirement irreconcilable with the Rule's design." *Amchem Products, Inc. v. Windsor* (1997), 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 27} In *Amchem,* plaintiffs sought certification for a class of thousands seeking recovery for asbestos-related claims. The Supreme Court cited the following as impediments to the *Amchem* class's cohesiveness: the large number of individuals, their varying medical expenses, disparate claims of those currently

injured individuals versus those who had not yet suffered injury, the plaintiffs' smoking histories, and family situations. Id. at 623–625, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 28} Similarly, in *Barnes*, the court held that cigarette smokers seeking to establish a class action against tobacco companies failed the cohesiveness requirement because "addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification. As in *Amchem*, plaintiffs were 'exposed to different * * * products, for different amounts of time, in different ways, and over different periods.' * * * These disparate issues make class treatment inappropriate." *Barnes*, 161 F.3d at 143, quoting *Amchem*, 521 U.S. at 624, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 29} The trial court in this case found sufficient "disparate factual circumstances here, precluding a Rule 23(B)(2) class action." Although the court did not specifically address those disparate circumstances in the same breath as examining Civ.R. 23(B)(2), the court did go into much detail in its Civ.R. 23(B)(3) predominance analysis, citing multiple individual questions of fact requiring examination for different plaintiffs within the proposed class. Individual questions identified by the trial court include whether Brush Wellman owed a duty, whether there was a breach of that duty, whether the statute-of-limitations defense applies, and questions of contributory negligence. The members of the proposed class span 46 years, multiple contractors, and multiple locations within the plant, and are estimated by the parties to number between 4,000 and 7,000.

{¶ 30} "[A]buse of discretion" connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. Given the depth of the trial court's predominance analysis and its reasoned conclusion that individual questions outweigh questions common to the class, we cannot hold that the trial court abused its discretion.

{¶ 31} Rather than addressing the proposed class's cohesiveness, the appellate court summarily determined that the class could be certified under Civ.R. 23(B)(2). Because we have today determined that the trial court did not abuse its discretion in determining that the proposed class in this suit fails the cohesiveness requirement, we reverse the appellate court judgment and reinstate the trial court's order denying class certification.

Judgment reversed.

MOYER, C.J., F.E. SWEENEY, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

RESNICK, J., dissents with opinion.

PFEIFER, J., dissents.

_____

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 32} This is a simple case involving a request to certify a relatively innocuous class under Civ.R. 23(B)(2). Appellees allege that between 4,000 and 7,000 independent-contractor employees, including themselves, were overexposed to beryllium byproducts while working various stints at one particular beryllium processing and manufacturing plant. They seek (or, if necessary, will amend their complaint to seek) the establishment of a court-supervised medical-monitoring program for purposes of early detection and treatment of a disease that can be contracted only through exposure to beryllium and that is not present in the general population. Appellees claim that "[t]he widespread dispersal of beryllium throughout the Elmore plant, together with the lack of proper air sampling and other monitoring measures, has created a toxic environment that poses a beryllium danger to every contractor employee."

{¶ 33} While certification of the proposed class might give rise to a limited number of questions peculiar to individual class members, which is the case in virtually all class actions, those inquiries are not likely to vitiate class cohesiveness or diminish class unity to the detriment of absent members. In fact, most of the complexities that are alleged to exist in this case have been artificially inserted and tend to dissipate upon closer analysis. In my opinion, the denial of certification in this case embodies an overly restrictive application of Civ.R. 23 and substantially hinders the remedial purpose of the rule. See *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 235–236, 12 OBR 313, 466 N.E.2d 875. For these and the following reasons, I respectfully dissent.

{¶ 34} I agree with the majority that the appropriate test for determining the injunctive nature of a medical-monitoring claim under Civ.R. 23(B)(2) is whether the program sought to be established involves court supervision. This test is decidedly effective in identifying and distinguishing injunctive medical-monitoring relief from compensatory medical-monitoring relief because it homes in on whether the relief is meant to provide the necessary means to facilitate early detection and treatment of a disease or is essentially a damage award for potential injury.

{¶ 35} I also agree that appellees' position throughout the trial court proceedings was at best ambiguous with regard to the type of medical-monitoring program they were seeking. While appellees did argue in the alternative that they were seeking injunctive relief under Civ.R. 23(B)(2) and damages under division (B)(3), they never actually proposed the option of a court-supervised

program. Thus, I agree with the majority that the trial court was well within its discretion in denying certification under Civ.R. 23(B)(2) for the reason that appellees, despite their present protests to the contrary, never actually requested a form of medical-monitoring relief at the trial court level that could clearly be considered injunctive in nature.

{¶ 36} As the majority points out, however, "a request for court supervision could be easily added by an amended complaint." Consequently, if the court chose to conclude its analysis at this juncture, a final disposition of class certification would be needlessly postponed until after the complaint is amended upon remand and the trial court once again "finds the presence of disparate factual circumstances here, precluding a Rule 23(B)(2) class action." Thus, I also agree with the majority's decision not to reverse the appellate court's judgment on this basis, but instead to consider whether the trial court abused its discretion in finding that the proposed class is insufficiently cohesive to warrant certification under Civ.R. 23(B)(2).

{¶ 37} Civ.R. 23(B)(2) permits class actions for injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." In its "cohesiveness" analysis, the majority essentially (and appropriately) engrafts Civ.R. 23(B)(3)'s predominance requirement onto class actions for injunctive relief under division (B)(2). Although division (B)(2), unlike division (B)(3), contains no specific requirement that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," it does require that a proposed class have sufficient unity so that final injunctive relief is appropriate "with respect to the class as a whole." Considering that both provisions test whether proposed classes are cohesive enough to justify representative litigation, as well as the need to protect unnamed or absent class members who have no opportunity to opt out, the courts have been sufficiently impressed to find that division (B)(2) includes an implicit predominance requirement. See, e.g., *Philip Morris, Inc. v. Angeletti* (2000), 358 Md. 689, 785, 752 A.2d 200; *Thompson v. Am. Tobacco Co.* (D.Minn. 1999), 189 F.R.D. 544, 557; *In re Diet Drugs Products Liability Litigation* (Aug. 26, 1999), E.D.Pa. No. Civ. A. 98–20626, 1999 WL 673066, at * 9–10; *Dhamer v. Bristol–Myers Squibb Co.* (N.D.Ill.1998), 183 F.R.D. 520, 529. It is in the application of that requirement, however, that I believe the majority goes far astray.

{¶ 38} In finding that the class proposed for certification in this case "fails for lack of cohesiveness," the majority draws heavily, if not exclusively, on *Amchem Products, Inc. v. Windsor* (1997), 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689, and *Barnes v. Am. Tobacco Co.* (C.A.3, 1998), 161 F.3d 127, which is astonishing. From the standpoint of cohesiveness, the classes conceived in *Amchem* and

*Barnes* are completely dissimilar to the present proposed class, and the majority's very reliance on those cases serves to illustrate the inherent weakness in its position.

{¶ 39} The enormousness and complexity of the endeavor in *Amchem* are hardly apparent from the majority's minimizing depiction of that case as involving "a class of thousands seeking recovery for asbestos-related claims." *Amchem* involved what is quite possibly the most adventuresome, incoherent, and unwieldy class ever proposed in the history of class-action litigation. The class proposed for certification in *Amchem* "potentially encompasse[d] hundreds of thousands, perhaps millions, of individuals * * * [who were], or some day may be, adversely affected by past exposure to asbestos products manufactured by one or more of 20 companies." Id., 521 U.S. at 597, 117 S.Ct. 2231, 138 L.Ed.2d 689. It included every person who had ever been exposed, either by virtue of his or her own occupation or through the occupational exposure of a spouse or household member, to any asbestos-containing product anywhere in the United States, its territories, or while aboard American ships. Id., 521 U.S. at 602, 117 S.Ct. 2231, 138 L.Ed.2d 689, fn. 5. The high court's reference to "perhaps millions" of affected individuals is amplified by its reference to sources, including a 1991 Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation, which estimated that between 13 and 21 million workers had been exposed to asbestos over the last 40 or 50 years, that 200,000 asbestos-related deaths would occur by the year 2000, that several hundred thousand asbestos-related lawsuits had been filed, and that in one recent year, those lawsuits comprised more than six percent of all federal civil filings. Id. at 597–598, 117 S.Ct. 2231, 138 L.Ed.2d 689; see, also, id. at 631, 117 S.Ct. 2231, 138 L.Ed.2d 689 (Breyer, J., concurring in part and dissenting in part).

{¶ 40} It is not surprising that great factual disparities would exist among the members of such a daunting and amorphous class. By definition, class members were individually exposed to any one of a plethora of variegated asbestos-containing products manufactured by 20 different companies and distributed to different employers throughout the greater United States while working different jobs, at different locations, in different states, under widely divergent circumstances. And these factual disparities were compounded by significant differences in state law, which governed many of the class claims and varied widely on such critical issues as the ability of plaintiffs exposed to asbestos but without manifest injuries to pursue claims for medical monitoring. Id., 521 U.S. at 609–610, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689. In fact, the court based its denial of certification in large part on the absence of any request for compensation to exposure-only claimants on their medical-monitoring claims and the failure to establish a discrete, separately represented subclass of exposed but uninjured claimants who could either vie for a medical-monitoring fund against currently

injured plaintiffs seeking generous damage awards or present their claims in a series of statewide or more narrowly defined adjudications. Id. at 604, 606, 611, 626–627, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 41} Moreover, none of the parties in *Amchem* even attempted to argue that the action could actually be litigated. To the contrary, it was their hope and stated position that because the class was proposed for settlement purposes only, see Fed.R.Civ.P. 23(e), its certification would escape some of the more imposing qualifications under Fed.R.Civ.P. 23(a) and (b). The court, in fact, was so flabbergasted by the vastness and disunity of the proposal that it was compelled throughout its opinion to portray the endeavor in such grandiose terms as "global," " 'humongous,' " "a class action so large and complex [that it] 'could not be tried,' " "sprawling," "a grand-scale compensation scheme * * * fit for legislative consideration," "giant," and "nationwide." Id., 521 U.S. at 597, 610, 611, 622, 626, 628, 117 S.Ct. 2231, 138 L.Ed.2d 689, quoting the court of appeals (C.A.3, 1996), 83 F.3d 610, 630, 632. Indeed, the court acknowledged the unique historical composition of the class when it stated, "No settlement called to our attention is as sprawling as this one." Id. at 624, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 42} This is a far cry from a class of 4,000 to 7,000 Ohio workers claiming exposure to beryllium at a single beryllium manufacturing plant in Elmore, Ohio. In terms of size, complexity, cohesiveness, and unity, comparing *Amchem* to this case is tantamount to comparing the expanse and intricacies of the entire universe to a marble.

{¶ 43} The majority's reliance on *Barnes* is similarly flawed. As with *Amchem*, the majority tends to minimize the awesome scope and complexity of the action in *Barnes* by referring to it as a case of "cigarette smokers seeking to establish a class action against tobacco companies." *Barnes* involved a proposed class of over one million Pennsylvania residents who had smoked any of hundreds of different types of cigarettes manufactured by one or more of 16 major American tobacco companies that collectively sold 22.6 billion cigarettes annually in Pennsylvania. Id., 161 F.3d at 130–131, 132–133, 135. Moreover, none of the disparities that precluded certification in *Barnes* are present here, despite the majority's attempt to make it appear otherwise.

{¶ 44} The majority relies on an introductory statement in *Barnes* that enumerates several general issues that the court believed would have to be determined on an individual basis with respect to each class member. In that statement, the court in *Barnes* summarized what it would conclude from its analysis, i.e., that "addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification. As in *Amchem*,

plaintiffs were 'exposed to different * * * products, for different amounts of time, in different ways, and over different periods.' * * * These disparate issues make class treatment inappropriate." *Barnes,* 161 F.3d at 143, quoting *Amchem,* 521 U.S. at 624, 117 S.Ct. 2231, 138 L.Ed.2d 689.

{¶ 45} On its face, this quote appears to be significant because the present case also involves such generic issues as causation, the need for medical monitoring, and the like. But the majority fails to account for the succeeding discussion in *Barnes,* which clearly shows that class cohesion was found to be lacking in that case for reasons unique to cigarette litigation and inapposite to the matter at hand. In fact, the quoted paragraph from *Barnes* concluded with a footnote in which the court explained that "the individual issues raised by cigarette litigation often preclude class certification. * * * Significantly, no federal appeals court has upheld the certification [of] a class of cigarette smokers or reversed a District Court's refusal to certify such a class." Id., 161 F.3d at 143–144, fn. 19.

{¶ 46} The primary issue of nicotine addiction, which was found to be a "highly individualistic inquiry" and to play "a central role" in *Barnes,* 161 F.3d at 144, is simply absent here. This fact is significant, moreover, not only in its own right, but in particular because addiction is what led the court in *Barnes* to conclude that the generic issue of causation cannot be proved on a classwide basis. Thus, after finding that "addiction is the linchpin of causation in this case," the court explained that "plaintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases. * * * [W]hether defendants caused the injury depends on whether each individual actually is addicted. These are all issues that must be determined on an individual basis." Id., 161 F.3d at 144, 145.

{¶ 47} The need for medical monitoring was also held to preclude class certification in *Barnes* for reasons unrelated to the present action. Thus, the court explained:

{¶ 48} "In order to state a claim for medical monitoring [under Pennsylvania law], each class member must prove that the monitoring program he requires is 'different from that normally recommended in the absence of exposure.' *Redland* [*Soccer Club v. Dept. of the Army* (1997), 548 Pa. 178], 696 A.2d [137] at 146. To satisfy this requirement, each plaintiff must prove the monitoring program that is prescribed for the general public and the monitoring program that would be prescribed for him. Although the general public's monitoring program can be proved on a classwide basis, an individual's monitoring program by definition cannot. In order to prove the program he requires, a plaintiff must present evidence about his individual smoking history and subject himself to cross-examination by the defendant about that history. *This element* of the medical monitoring claim therefore raises many individual issues." (Emphasis added; footnote omitted.) Id., 161 F.3d at 146.

{¶ 49} This need-for-monitoring problem does not arise in the present case, since it is undisputed that the general public is not exposed to beryllium or in danger of contracting chronic beryllium disease ("CBD") and that the prescribed tests for detecting CBD, including a positive beryllium lymphocyte proliferation test ("BeLPT"), is not normally recommended in the absence of industrial exposure to beryllium. As explained by Brush Wellman, CBD "is a lung disease caused by immunologic response to beryllium particles." It is "an inherent risk of working with or around beryllium, and the Ohio legislature has specifically identified it as an allowable condition under Ohio Workers' Compensation Act. Ohio Rev.Code § 4123.68(V) ('berylliosis')." The disease is diagnosed on the basis of "a positive BeLPT and evidence of lung granuloma on bronchoscopy." There is no contention in this case that the BeLPT or any other prescribed test for CBD would be recommended to individual class members had they not been exposed to beryllium.

{¶ 50} Similarly, the following rationale advanced in *Barnes* for its holding that the statute of limitations raises too many individual questions to permit certification is obviously peculiar to cigarette litigation:

{¶ 51} "Under Pennsylvania law, the statute of limitations starts running when the plaintiff's cause of action accrues; a medical monitoring claim accrues when the plaintiff suffers a 'significantly increased risk of contracting a serious latent disease.' *Redland*, 696 A.2d at 145. Under plaintiffs' analysis, a cigarette smoker suffers this risk when he reaches the ten or twenty 'pack-year' level. * * * Under the pack-year approach to claim accrual, determining when a plaintiff's claim accrued necessitates two individual inquiries for each plaintiff: when he began smoking and how much he has smoked since then. The need to conduct such a determination for each plaintiff * * * makes a class action an improper method for resolving these claims." Id., 161 F.3d at 149.

{¶ 52} While both the majority and the trial court opine that the statute of limitations will necessitate individual inquiries in this case, neither articulates which statute of limitations is applicable or what individual inquiries might arise. Presumably, they envision individual questions with regard to some discovery standard or form of equitable tolling of whatever statute is applicable. However, this court has held that a trial court abuses its discretion when it denies certification merely because a statute of limitations might bar the claims of some class members, particularly where the class consists of persons who must rely on equitable tolling to overcome a statute-of-limitations defense. See *Hamilton v. Ohio Sav. Bank* (1998), 82 Ohio St.3d 67, 84, 694 N.E.2d 442.

{¶ 53} Finally, the *Barnes* court never actually held that any defense other than the statute of limitations was sufficient in itself to preclude certification. The court discussed four possible defenses: comparative negligence, contributory

negligence, consent, and assumption of risk. Id., 161 F.3d at 146–149. The court expressly declined to "rely on the presence of individual issues with [regard to] the defenses of consent and assumption of risk in reaching [its] decision to affirm class decertification." Id. at 149. Nor did the court "decide whether the Pennsylvania Supreme Court would apply the Comparative Negligence Act to plaintiffs' negligence claim." Id. at 147. Instead, the court suggested that the defendants would have available either a comparative-negligence or a contributory-negligence defense. But the court did not find that the availability of either defense would justify a denial of certification. To the contrary, the court "explicitly acknowledge[d] that the existence of affirmative defenses as to some class members may not by itself [be] enough [to] warrant the denial of certification," which then compelled the court to "note that the defenses are only one of many matters raising individual issues in this case." Id. at 147, fn. 25.

{¶ 54} One would expect that if other cases are to serve as guidance in the present matter, they ought to involve the certification of fairly comparable classes. Yet no two classes could be more distinct from the present class in terms of cohesiveness than those proposed for certification in *Amchem* and *Barnes*. Those cases involved truly colossal classes of diffuse individuals asserting an entire universe of products-liability claims against all the major manufacturers of a potentially toxic product. They are markedly different from this case in terms of class size, the nature of the claims presented and the number of defendants against whom they are asserted, the geographical range of exposure, the multiplicity and variety of products to which individual class members were exposed, the relevance of past medical histories, and other important factors bearing on the issue of class cohesion.

{¶ 55} It would be far more appropriate to review Fed.R.Civ.P. 23 decisions that involve (1) smaller, less innovative classes of toxic-tort claimants, (2) a single defendant or a limited number of defendants, (3) the release of a toxic substance at a single location or facility or from a single source, (4) claims that are not dependent upon proof of addiction, and (5) the situation where different class members have been exposed to different amounts or levels of a toxic substance over different periods of time.

{¶ 56} In *Cook v. Rockwell Internatl. Corp.* (D.Colo.1993), 151 F.R.D. 378, property owners who lived near Rocky Flats, a federal weapons-production facility in Denver, Colorado, brought suit against the facility's successive operators, Dow Chemical and Rockwell International, for allegedly releasing radioactive and other substances into the surrounding area. Plaintiffs sought certification of two classes, one a medical-monitoring class under either Fed.R.Civ.P. 23(b)(2) or (b)(3) and the other a property class under Fed.R.Civ.P. 23(b)(3). The medical-monitoring class, which had approximately 43,000 members, included any

person who lived within a certain area surrounding the Rocky Flats facility between 1952 and 1989, however brief the period of residence. The property class included all persons or entities owning an interest in any of the approximately 15,000 parcels of property situated within a defined area around the facility.

{¶ 57} The court first discussed the issue of differential and durational exposures under the commonality requirement of Fed.R.Civ.P. 23(a)(2):

{¶ 58} "Common questions include whether defendants' operation of Rocky Flats involved an ultrahazardous activity, premising strict liability, and posed an unreasonable risk of harm, constituting negligence, and/or amounted to interference with the use or enjoyment of property constituting a nuisance. Defendants argue that proof with respect to the foregoing would vary from class member to class member because each claimant lived in the area at different times and would have been affected in a different way by operations of either Dow or Rockwell which varied over time. With these differences, defendants claim that the commonality requirement cannot be met.

{¶ 59} "However, although Dow and Rockwell may have operated the plant at different times and there may have been differing amounts of releases of hazardous substances affecting different individuals at different times, this does not negate that there are some questions of law or fact common to the two classes." Id., 151 F.R.D. at 385.

{¶ 60} The court then discussed the issue of differential exposures with regard to each proposed class under Fed.R.Civ.P. 23(b). With regard to Fed.R.Civ.P. 23(b)(2), the court found:

{¶ 61} "Dow further argues that any injunctive relief will not apply to the class as a whole because of the individualized nature of each individual's claim. However, common evidence would be required to establish the level and nature of injury or disease by substances released from Rocky Flats and the causal connection, if any, between the release of the substances and any injuries or disease allegedly sustained. Therefore, despite the fact that there would be some issues of individual proof, injunctive relief in the form of medical monitoring would seem appropriate to the class as a whole." Id., 151 F.R.D. at 388.

{¶ 62} With regard to Fed.R.Civ.P. 23(b)(3) and the property class, the court further explained that although "there are some questions of fact and law in this case which will require individualized proof * * *, including the time when each plaintiff lived in the area, the duration of each plaintiff's stay in the area and possible statute of limitation defenses[,] * * * common issues represent the core of plaintiffs' action against defendants and to the extent that the claim of each plaintiff depends upon proof concerning these common issues, it would serve no purpose to force multiple trials to hear the same evidence and decide the same

issues. As I remarked in *Joseph* [*v. Gen. Motors Corp.* (D.Colo.1986), 109 F.R.D. 635, 642], '[w]ere plaintiffs to bring separate actions, these questions would necessarily be relitigated over and over, and the same evidence would be presented in each case.' " Id., 151 F.R.D. at 388–389.

{¶ 63} In a subsequent decision, the court in *Cook* decertified the medical-monitoring class because, as it turned out, that class was seeking primarily money damages. However, the court adhered to its previous decision that the medical-monitoring class was sufficiently cohesive to warrant certification and retained certification of the property class. See *Cook v. Rockwell Internatl. Corp.* (D.Colo.1998), 181 F.R.D. 473, 478, 480.

{¶ 64} *Cook* is representative of various cases in which similar types of classes of toxic-tort claimants have been certified under Fed.R.Civ.P. 23(b)(2) or (b)(3), despite variations among class members as to times and durations of exposure. Collectively, the courts in these cases recognize that it is not necessary for common issues to completely determine the action in order for the requirements of predominance or class cohesiveness to be satisfied. The very fact that the predominance requirement measures and compares the common and individual questions to be decided in the action means that certification may be warranted despite the mere presence of individual inquiries. The ultimate question is whether there are common issues of liability and whether those issues predominate. These courts also point out that class actions were designed not only as a means for the vindication of small claims, but also to achieve economies of time, effort, and expense. In these cases, especially where multiple products or chemical substances are not involved and where exposure emanates from a single source or occurs at a single facility, it is a waste of judicial economy to require each affected individual to spend days, weeks, or even months presenting the same witnesses, the same exhibits, and the same issues in trial after separate trial. See *Elliott v. Chicago Hous. Auth.* (Feb. 28, 2000), N.D.Ill. No. 98 C 6307, 2000 WL 263730; *Katz v. Warner–Lambert Co.* (S.D.N.Y.1998), 9 F.Supp.2d 363; *Craft v. Vanderbilt Univ.* (M.D.Tenn.1996), 174 F.R.D. 396; *Yslava v. Hughes Aircraft Co.* (D.Ariz.1993), 845 F.Supp. 705; *Day v. NLO, Inc.* (S.D.Ohio 1992), 144 F.R.D. 330; *Sterling v. Velsicol Chem. Corp.* (C.A.6, 1988), 855 F.2d 1188; *Jenkins v. Raymark Industries, Inc.* (C.A.5, 1986), 782 F.2d 468. Thus, where differential exposures are alleged to create a problem of individualized proof, particularly when the class is broadly defined to include even those persons who were exposed for a brief moment, courts have certified the class while either ordering the plaintiffs to submit amended class definitions or reserving to themselves the right to impose durational exposure requirements as warranted by the evidence at trial. See *Elliott; Craft*, 174 F.R.D. at 403; *Day,* supra; see further, *Cook,* supra, 151 F.R.D. at 384, fn. 1; *In re Diet Drugs,* supra, 1999 WL 673066, at * 11–13, * 17–18.

{¶ 65} In denying certification in this case, the trial court primarily found that individualized proof would be necessary to resolve the general issue of Brush Wellman's duty to the various members of the class. Relying on *Wellman v. E. Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E.2d 629, and its progeny, the trial court reasoned that a property owner is not ordinarily charged with a duty to protect an independent contractor's employees from inherent workplace hazards, unless the owner actively participates in the performance of the employee's work. The trial court relied particularly upon *Sopkovich v. Ohio Edison Co.* (1998), 81 Ohio St.3d 628, 643, 693 N.E.2d 233, where this court explained that "active participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, *or where the owner retains or exercises control over a critical variable in the workplace.*" (Emphasis added.) The trial court found, however, that Brush Wellman's control over the release and levels of beryllium was not sufficient to establish a common duty of care with respect to the class as a whole. In so doing, the trial court agreed with Brush Wellman that under the critical-variable aspect of the active-participation analysis, "a duty arises only where Brush expressly undertook specific responsibilities to protect an individual from exposure and failed to do what it promised to do." Thus, the trial court appears to conclude that the extent to which Brush Wellman assumed a duty of protection, if at all, would have to be determined on an individual basis, presumably with regard to each project and each independent contractor that performed work at the Elmore plant over the years.

{¶ 66} The problem with the trial court's analysis, however, is that *Wellman* is not applicable. And if *Wellman* is not applicable, the individual questions that are claimed to arise by virtue of its application disappear.

{¶ 67} Under *Sopkovich,* a property owner owes a duty to an independent contractor's employees when the owner actively participates in the performance of the contracted-for work, and this occurs where the owner retains or exercises control over a critical variable in the workplace. Conceptually, "active participation" is not really an exception to the no-duty rule of *Wellman,* even though labeled as such in *Sopkovich,* 81 Ohio St.3d at 638, 693 N.E.2d 233, but instead defines the limits of its applicability. But regardless of how it is conceptually viewed, *Wellman* does not apply where the agency or instrumentality of harm is controlled by the owner.

{¶ 68} The trial court's basic mistake is reading *Sopkovich* too narrowly. According to the trial court, *Sopkovich* proposes that the element of control in the critical-variable analysis is satisfied only where the owner makes an express promise to perform a specific duty. In support of this assertion, the trial court

relied on the following quote from *Sopkovich,* 81 Ohio St.3d at 643, 693 N.E.2d 233:

{¶ 69} "Ohio Edison's participation in this case was clearly limited to the tasks of de-electrification of certain conductors in the work area and the dissemination of correct information concerning which conductors were energized and which had been de-activated. Therefore, as the court of appeals correctly recognized, Ohio Edison's liability (if any) may only be predicated on a breach of a specific duty that Ohio Edison undertook to perform * * *."

{¶ 70} Contrary to the trial court's assertion, however, this quote clearly does not establish a general requirement that an owner's liability under the critical-variable analysis must be predicated on a breach of an express promise to perform a specific duty. It merely conveys that Ohio Edison exercised critical control in that case by virtue of the fact that it promised to perform a specific duty and that its liability, therefore, was limited to a breach of that duty. If the court meant that in all cases active participation may be found to exist only where a property owner expressly promises the performance of a specific duty, rather than where the owner retains or exercises control over a critical variable, it would have said precisely that. Simply put, an owner's express promise to perform a duty is one way, but not the only way, to establish that the owner retained or exercised control over a critical variable in the workplace.

{¶ 71} In this case, the instrumentality of harm is the manufacture and processing of beryllium, the release and levels of which were at all times within the exclusive control of Brush Wellman. The alleged overexposure to beryllium in this case did not emanate from the execution of the contracted-for work. Instead, the critical acts that are alleged to have caused the need for medical monitoring are those of Brush Wellman alone. Under these circumstances, it is irrelevant whether Brush Wellman specifically agreed to retain or exercise control over the releases of beryllium dust and fumes, for it never relinquished control over this critical variable. Thus, Brush Wellman's participation in this case gives rise to a common duty of care with respect to the proposed class.

{¶ 72} This is not to say that the present proposed class should be permanently certified. If it appears at any time that plaintiffs are actually seeking primarily money damages, the trial court may exercise its power to decertify the Civ.R. 23(B)(2) class at that time. Nor am I suggesting that no individual questions are likely to arise. At some point, it may very well become necessary to establish an exposure formula and/or durational exposure requirements for purposes of both causation and class membership. But such devices would be exclusionary in nature and, therefore, eliminate individual issues. Basically, however, the individual questions identified by the trial court are mostly nonexistent, and reliance on them, in my opinion, constitutes an abuse of discretion. The proposed class is

relatively small, not large, and certainly not unwieldy. This case does not involve multiple or even successive defendants, but only one defendant. This is not a situation where the risk of contracting various diseases must be traced to any number of different toxic substances. The representatives of the proposed class allege that its class members are at risk of contracting only one particular kind of industrial disease as a result of being exposed to one particular kind of toxic substance while working at a single manufacturing plant.

{¶ 73} For all of the above reasons, I would find that the trial court abused its discretion with regard to the issue of class cohesiveness. I would remand the cause for further proceedings, including the submission of an amended complaint and the conditional certification of the proposed class.

PFEIFER, J., concurs in the foregoing dissenting opinion.

---

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley and Louise M. Roselle; Lipton Law Offices and Andrew S. Lipton; Mohler Law Office and George Gerken, for appellees.

Jones Day, Jeffery D. Ubersax and Robert S. Faxon, for appellant.

Legal Consulting Services, Inc., and Elisa P. Pizzino; Washington Legal Foundation, Daniel J. Popeo and Richard A. Samp, urging reversal on behalf of amicus curiae Washington Legal Foundation.

O'Melveny & Myers, L.L.P., John H. Beisner and Jonathan D. Hacker, urging reversal for amicus curiae Product Liability Advisory Council, Inc.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell and Anne Marie Sferra, urging reversal for amicus curiae Ohio Manufacturers' Association.