RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JONATHAN HIRSCH; JEANNE MYERS,
Individually and on behalf of all others
similarly situated,

*Plaintiffs*,

No. 09-4548

CHRISTOPHER MANN, Individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant,*

*v.*

CSX TRANSPORTATION, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-03512—Dan A. Polster, District Judge.

Argued: April 21, 2011

Decided and Filed: September 8, 2011

Before: KENNEDY, BOGGS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christopher D. Stock, WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A., Cincinnati, Ohio, for Appellant. Scott L. Winkelman, CROWELL & MORING LLP, Washington, D.C., for Appellee. **ON BRIEF:** Christopher D. Stock, Paul M. De Marco, WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A., Cincinnati, Ohio, John R. Climaco, CLIMACO, LEFKOWITZ, PECA, WILCOX & GAROFOLI CO., L.P.A., Cleveland, Ohio, Frank E. Piscitelli, Jr., FRANK PISCITELLI CO., L.P.A., Cleveland, Ohio, for Appellant. Scott L. Winkelman, William L. Anderson, Beth M. Kramer, April N. Ross, CROWELL & MORING LLP, Washington, D.C., Mary M. Bittence, BAKER HOSTETLER, Cleveland, Ohio, for Appellee. Mark A. Behrens, Christopher E. Appel, SHOOK, HARDY & BACON L.L.P., Washington, D.C., for Amici Curiae.

1

---

**OPINION**

---

BOGGS, Circuit Judge.  Following a train crash that allegedly exposed a small town to cancer-causing agents, the Plaintiffs-Appellants sought damages on behalf of a putative class.  The district court granted summary judgment for the train company, CSX Transportation (CSX), because the Plaintiffs had not established general or specific causation and, as a matter of law, any increased risk of cancer or other diseases was too insignificant to warrant the court's ordering a lengthy period of medical monitoring.  We affirm.

I

On October 10, 2007, thirty-one cars of a CSX train derailed and caught fire near the town of Painesville, Ohio.  The fire was serious.  It lasted nearly three days and emergency personnel removed about 1,300 people from the surrounding half-mile radius.  Most of what burned in this fire was non-toxic, but nine of the cars were carrying hazardous materials.  The Plaintiffs claim that 2,800 tons of burning material were sent into the surrounding atmosphere, and that the fire produced toxic chemicals even from non-toxic cargo—in particular, the Plaintiffs claim that the level of dioxin in their town was significantly elevated.

A day after the fire began (and presumably while it was still burning), several residents of the town brought the present suit against CSX, initially alleging causes of action in negligence, nuisance, strict liability, trespass, and medical monitoring under Ohio law.  CSX eventually moved to dismiss the Plaintiffs' complaint and the district court dismissed everything except the negligence claim.  Although the district court did not allow the Plaintiffs to pursue an independent cause of action for medical monitoring, the court was clear that court-supervised medical monitoring was available as an equitable remedy under Ohio law.  *See Wilson v. Brush Wellman*, 817 N.E.2d 59, 63-65 (Ohio 2004); *see also Day v. NLO*, 851 F. Supp. 869, 880 (S.D. Ohio 1994) ("[W]here

periodic future medical treatment[s], including tests, are required these have traditionally been granted as compensable future medical expenses."). After discovery, CSX moved for summary judgment, claiming that the Plaintiffs had failed to adduce evidence sufficient to create a genuine issue of material fact requiring a trial.

The Plaintiffs responded by pointing out the evidence in their favor. CSX had already stipulated that it breached a duty when its train derailed. Thus, the Plaintiffs needed only to create an issue of material fact on the other element of negligence under Ohio law—that CSX's breach proximately caused injury to them. *Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984).

To show causation and injury, the Plaintiffs hired several experts. Marco Kaltofen, P.E., is a chemical engineer who tested the community for levels of dioxin. He assumed a normal background level of dioxin at 4 parts per trillion (ppt) and took measurements around Painesville to compare with this baseline. His measurements showed elevated levels at the crash site (10.7 ppt) and a range within homes in the area from 11.7 ppt to 274 ppt. Dr. John Jacobus, Ph.D., is a chemist who speculated as to the amount and content of the cargo burned. Dr. Erno Sajo, Ph.D., is a physicist who plotted the dispersion and concentration of the chemicals from the fire on a map for the purpose of showing which members of the community were exposed to what levels of dioxin. Dr. Sajo used figures from Dr. Jacobus's report as well as meteorological data to make these projections. Dr. James Kornberg, M.D., used this map to determine who in the community was likely exposed to levels of dioxin above what the EPA considers acceptable—levels at which the risk of cancer increases by one case in one million exposed persons.

After reviewing this and other evidence, the district court granted summary judgment to CSX. The court held that the Plaintiffs had failed to meet their burden to show that "(1) the dioxin[s] released into the air by the fire are known causes of human disease" and "(2) the named Plaintiffs were exposed to . . . dioxin in an amount sufficient to cause a significantly increased risk of disease such that a reasonable physician would order medical monitoring." The Plaintiffs timely appealed.

II

We review a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). To survive summary judgment, the "mere existence of a scintilla of evidence in support" of a party's position will not suffice. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 252). Rather, "'there must be evidence on which the jury could reasonably find for the' non-moving party." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 252). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In a diversity case, such as this one, "we follow the law of Ohio as announced by that state's supreme court." *Miles v. Kohli & Kaliher Associates, Ltd.*, 917 F.2d 235, 241 (6th Cir. 1990). However, "[w]here the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Ibid.* (citing *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)).

III

This case comes to us in a rather unusual posture. The Plaintiffs presented a number of experts supporting their positions, and there were no motions or rulings to exclude any of them. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Nonetheless, the district court granted summary judgment for CSX, dismissing the expert reports (though relevant) as insufficient to create a genuine issue of material fact. The Plaintiffs argue that this dismissal was inappropriate without a *Daubert* ruling. We therefore begin by distinguishing the *admissibility* of evidence from its *sufficiency*. Even where an expert's evidence is ruled admissible under the *Daubert* standards, a district

court remains free to decide that the evidence amounts to no more than a mere scintilla. *Daubert*, 509 U.S. at 596. In that case, the court remains free to grant summary judgment. *Ibid.*; *see also In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 750 n.21 (3d Cir. 1994) (noting that even if expert evidence is admissible, the court may still grant summary judgment where that evidence amounts to no more than a scintilla). Thus, a close review of the expert evidence is still appropriate.

We next turn to the merits of this case. To succeed on a negligence claim in Ohio, the Plaintiffs must show the basic elements taught to every first-year law student: duty; breach; causation; and damages. This is a complicated case, but negligence is a simple concept. If Dan drops a banana peel on the sidewalk and Pete slips on the peel and breaks his hip, Pete must prove four things at trial to recover for his hip injury: 1) that Dan should not have dropped the banana peel on the sidewalk (duty); 2) that he nonetheless did (breach); 3) that Pete's broken hip was suffered because of the banana peel (causation); and 4) that Pete actually broke his hip (damages). What makes the present claim conceptually unique is that the Plaintiffs—though no doubt distraught from the stress of a train crash and evacuation—have, even by their own admission, as of now not suffered any discernable compensable injury. Rather, their alleged injuries consist solely of the increased risk of—and corresponding cost of screening for—certain diseases that, according to Plaintiffs, are more likely to occur as a result of the train crash. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 825-26 (D.C. Cir. 1984). Assuming that Ohio would recognize such an injury, the remedy could be a medical monitoring program that would spare the Plaintiffs these expenses. But the question remains: are these Plaintiffs actually at such an increased risk of disease that they are entitled to a medical monitoring program?

After all, not every increased risk of disease warrants increased medical scrutiny. The expenses must be *reasonable*. *See Friends for All Children*, 746 F.2d at 825; *Day*, 851 F. Supp. at 880. In other words, for the Plaintiffs to prevail, there must be evidence that a reasonable physician would order medical monitoring for them.

On this point, Plaintiffs have failed to produce evidence creating a genuine issue. They point only to Dr. Kornberg's conclusory statement that "a reasonable physician would prescribe for the Plaintiffs and the putative class a monitoring regime." Although juries are generally free to believe expert witnesses, *see Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 507 (6th Cir. 1998), a plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue, *see Williams v. Ford Motor Co.*, 187 F.3d 533, 543-44 (6th Cir. 1999); *Zettle v. Handy Mfg. Co.*, 998 F.2d 358, 360-61 (6th Cir. 1993).

Under these standards, Dr. Kornberg's affidavit is plainly insufficient. Dr. Kornberg not only accepted the risk of one in a million as the threshold for monitoring, but appears to have halved it. "One should be afforded the benefit of medical monitoring, if one has sustained a dose equal to or in excess of 50% of the EPA maximum." There is little explanation as to why Dr. Kornberg believed that reasonable physicians would order expensive and burdensome testing for such a small risk, but he agreed in his deposition that his proposal for Painesville was "to err on the side of patient safety."

Further, Dr. Kornberg based his assessment on the evidence of Dr. Sajo. According to Dr. Kornberg, any person who lived for eighteen months within a zone on Dr. Sajo's map where there was a projected exposure level of 43.9 ppt or higher would be likely to have an additional one-in-a-million risk of developing cancer, and therefore it would be medically reasonable to order monitoring.

But the map itself is highly unreliable. Dr. Sajo relied on Dr. Jacobus's account of the total material burned, though acknowledging that those numbers were themselves speculative. Dr. Sajo also admitted that "the fire temperature, particle size distribution, and fire area were not established." Thus, we are left with a report speculating (based on speculation) that the Plaintiffs *might* have been exposed to quantities of dioxin somewhere in the ballpark of 43.9 ppt, and that their risk therefore might (or might not) be somewhere around 50% of a one in a million additional risk of developing cancer.

The Plaintiffs claim that two of them, Dawn and Brian Ryan, can rely not just on Dr. Sajo's map, but also on a dioxin reading taken by Kaltofen in their home to establish their increased risk. Although the measurement in their home was above estimated background levels (274 ppt rather than 4 ppt), no expert attempted to show that the level was elevated as a result of the train fire. Kaltofen himself stated that there are a number of reasons why household dioxin levels might be elevated, including poor ventilation of a furnace, a fireplace or other fuel use within the house, and smoking by the inhabitants. Both of the Ryans indicated that they smoke, although Dawn Ryan was adamant that they do not smoke in the house. Nonetheless, without any expert opinion ruling out these other causes for the elevated reading, this evidence is also of little help in creating an issue of fact for the jury.

Beyond the uncertainty surrounding the Plaintiffs' exposure, there is still more reason to question Dr. Kornberg's assessment: a one-in-a-million chance is small. Indeed, it is proverbially small. If something has a one-in-a-million chance of causing cancer in an individual, then it will *not* cause cancer in 999,999. For some perspective, the National Safety Council estimates a person's lifetime risk of dying in a motor vehicle accident as 1 in 88. The lifetime risk of dying in "air and space transport accidents" is roughly 1 in 7,000. The risk of being killed by lightning is roughly 1 in 84,000, while the risk of being killed in a "fireworks discharge" stands at around 1 in 386,000. NATIONAL SAFETY COUNCIL, INJURY FACTS 37 (2011 ed.), *available at* http://www.nsc.org/NSC%20Picture%20Library/ News/web_graphics/Injury_Facts_37.pdf. These risks—of death, not disease—are all much smaller than what the Plaintiffs allege in this case: lifetime odds of developing cancer at 50% of 1 in 1,000,000. To even approach that number, we can look at the average person's risk of dying from bathtub drowning *in any given year* (1 in 840,000). HARVARD CENTER FOR RISK ANALYSIS, http://www.hcra.harvard.edu/quiz.html (last visited Sept. 6, 2011).

In light of all of the above, Dr. Kornberg's statement is simply insufficient to establish a genuine issue of material fact regarding whether reasonable physicians would

prescribe a medical monitoring regime for the Plaintiffs. Viewing the facts of this case together, the Plaintiffs have alleged only a risk that borders on legal insignificance, have failed to produce evidence establishing even this hypothetical risk with any degree of certainty, and have demanded a jury trial based upon their expert's review of this evidence and conclusory statement of the relevant legal standard. In this context, Dr. Kornberg's affidavit amounts to a "mere . . . scintilla" of evidence. *Shropshire*, 550 F.3d at 576.

IV

The Plaintiffs in this case have failed to produce sufficient evidence such that a reasonable jury could believe that a reasonable physician would order medical monitoring. Our holding today does not foreclose any number of possibilities; for example, perhaps the Plaintiffs might have been able to survive summary judgment had Dr. Kornberg provided some indication of why medical monitoring would be the standard practice for risks this remote. Perhaps, though we do not require blood tests in every toxic tort case, *see Redland Soccer Club v. Dep't of the Army*, 55 F.3d 827, 847 (3d Cir. 1995), the Plaintiffs might have survived summary judgment had they obtained conclusive medical evidence that they faced a one-in-a-million increased risk of cancer. Those would be harder cases, and we leave them for another day. In this case, the Plaintiffs have failed to show a genuine issue of material fact. We therefore AFFIRM the judgment of the district court.