[Cite as *Hupp v. Beck Energy Corp.*, 2014-Ohio-4255.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| CLYDE HUPP, et al., | ) | |
| | ) | CASE NOS.   12 MO 6 |
| PLAINTIFFS-APPELLEES, | ) | 13 MO 2 |
| | ) | 13 MO 3 |
| - VS - | ) | 13 MO 11 |
| | ) | |
| | ) | |
| BECK ENERGY CORPORATION, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| XTO ENERGY, INC., | ) | |
| | ) | |
| PROPOSED | ) | |
| INTERVENOR/APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeals from Monroe County
                             Common Pleas Court,
                             Case No. 2011-345.

JUDGMENT:                    Case Nos. 12MO6, 13MO3 & 13MO11
                             Affirmed in Part and Reversed in Part
                             and Remanded.

                             Case No. 13MO2
                             Appeal Dismissed as Moot.

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                             Dated: September 26, 2014

**[Cite as *Hupp v. Beck Energy Corp.*, 2014-Ohio-4255.]**

APPEARANCES:

For Plaintiffs-Appellees:

Attorney Richard V. Zurz, Jr.
Attorney Mark A. Ropchock
Slater & Zurz, LLP
One Cascade Plaza, Suite 2210
Akron, OH  44308-1135

Attorney James W. Peters
Peters Law Offices
107 W. Court Street
Woodsfield, OH  43793

For Defendant-Appellant:

Attorney Scott M. Zurakowski
Attorney William G. Williams
Attorney Nathan D. Vaughan
Attorney Gregory W. Watts
Attorney Aletha M. Carver
Krugliak, Wilkins, Griffiths & Dougherty Co. L.P.A.
4775 Munson Street, N.W.
P.O. Box 36963
Canton, OH  44735-6963

For Proposed Intervenor/Appellant:

Attorney Clair E. Dickinson
Brouse McDowell
388 S. Main Street, Suite 500
Akron, OH  44311

Attorney Andrew J. Pollis
1305 Yellowstone
Cleveland, OH  44121

Attorney Kevin C. Abbott
Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222-2716

Attorney William J. Taylor
Kincaid, Taylor & Greer
50 North 4th Street
Zanesville, OH  43701

For Amicus Curiae:

Attorney John K. Keller
Attorney Lija Kaleps-Clark
Vorys, Sater, Seymour & Pease LLP
52 E. Gay Street
Columbus, OH  43216-1008
Counsel for United Association of Plumber and
Pipefitters, et al.

DeGenaro, P.J.

{¶1} Defendant-Appellant, Beck Energy Corp. (Beck), appeals the July 31, 2012, February 8, 2013 and June 10, 2013 judgments of the Monroe County Court of Common Pleas. Plaintiffs-Appellees are six named Monroe County oil and gas lessors (the named plaintiffs), together with a class of similarly situated Ohio lessors. Appellees, when referred to collectively herein, will be called "the Landowners." Respectively, these three appealed judgments: (1) granted summary judgment in favor of the named plaintiffs; (2) granted the named plaintiffs' motion for class certification; and (3) more specifically defined the class, pursuant to a limited remand order from this court. These judgments generated three appeals: Case Nos. 12MO6, 13MO3 and 13MO11.

{¶2} Proposed Intervenor-Appellant, XTO Energy, Inc. (XTO), appeals the February 8, 2013 judgment of the Monroe County Court of Common Pleas, overruling its motion to intervene as a defendant, and generated a fourth appeal, Case No. 13MO2. All four appeals have been consolidated.

{¶3} In 13MO3, Beck argues that the trial court erred by certifying a class after it granted summary judgment on the merits because it violates the rule against one-way intervention, as well as by failing to hold a class certification hearing. In 13MO11, Beck asserts that the trial court abused its discretion by defining the class more broadly than that requested in the second amended class action complaint and motion for class certification. The trial court did not abuse its discretion by certifying the class after granting summary judgment on the merits because the rule against one-way intervention does not apply to Civ.R. 23(B)(2) classes. There was sufficient opportunity for factual development so as to permit a meaningful determination regarding the class action certification, thus rendering a hearing unnecessary. With regard to class definition, the trial court has discretion to modify the class, even sua sponte, and it did not abuse its discretion by defining the class as all Ohio lessors who executed a Form G&T 83 Lease with Beck, where Beck had neither drilled nor prepared to drill a well, nor included the property in a drilling unit.

{¶4} In 12MO6, Beck argues that the trial court erred by concluding that the leases at issue are void against public policy and that Beck violated the implied

covenant to reasonably develop the leaseholds. The trial court misinterpreted the pertinent lease provisions and Ohio case law on the subject and erred in concluding the Lease is a no-term, perpetual lease that is void ab initio as against public policy. The Lease has a primary and secondary term, it is not perpetual. The trial court further erred in concluding the Lease was subject to implied covenants and that Beck breached the implied covenant to reasonably develop. Beck's remaining assignments of error in 12MO6 are moot.

{¶5} In Case No. 13MO2, XTO argues that the trial court abused its discretion by failing to permit it to intervene in the proceedings. However, in light of our resolution of Beck's assignments of error, XTO's appeal is moot.

{¶6} Accordingly, in Case Nos. 12MO6, 13MO3, and 13MO11, the trial court's class certification and definition judgments are affirmed, and its order granting summary judgment is reversed and remanded to the trial court for further proceedings, and Case No. 13MO2 is dismissed as moot.

## Facts and Procedural History

{¶7} This case involves class action claims filed by the Landowners as oil and gas lessors, against Beck, an oil and gas lessee, seeking declaratory judgment and quiet title. On September 14, 2011, the suit began when a complaint was filed in the Monroe County Court of Common Pleas by four of the Landowners against Beck. On September 29 and 30, 2011, an amended and then a second amended class action complaint were filed. The second amended class action complaint removed the Hupps as plaintiffs, added several named plaintiffs, and asserted the claims as a class action. Further, the named plaintiffs alleged that they, along with approximately 400 additional landowners/lessors in Monroe County, executed essentially identical oil and gas leases with Beck, or are successors in interest to said lessors.

{¶8} The Landowners' Leases with Beck were form leases, known as the Form G&T 83 Lease, a preprinted oil and gas lease that left blank lines to be completed for the parties' names, addresses, date of execution, description of the leasehold, the delay rental term, and the amount of the delay rental payment. The

Leases provided for a one-eighth (12%) royalty for the Landowners should wells be drilled and gas and oil produced.

{¶9} Most pertinent to this appeal are two Lease clauses. Paragraph two contains the habendum clause, which provides that the Lease will continue "for a term of ten years and so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil or gas * * *." Paragraph three, the delay rental clause, provides that the Lease will terminate if a well was commenced within 12 months of the date of Lease execution, unless the lessee paid a specified delay rental.

{¶10} With regard to the named plaintiffs, they all own property in Monroe County subject to Form G&T 83 leases. Larry and Lori Hustack are successors-in-interest to land encumbered by an oil and gas lease entered into with Beck on August 14, 2008, presently covering 89.75 acres, with a primary term of ten years and specifies a delay rental payment of $108.00. Lawrence and Lieselotte Hubbard entered into a lease agreement with Beck on March 2, 2006, covering 55.06 acres, with a primary term of ten years and specifies a delay rental payment of $56.00. David Majors entered into a lease with Beck on October 11, 2005, covering 55 acres, and has a primary term of ten years and specifies a $55.00 delay rental payment.

{¶11} The named plaintiffs asserted: 1) that the Leases contained terms and conditions contrary to public policy, because they were allegedly leases in perpetuity without timely development; 2) that Beck had failed to prepare to drill or to actually drill any wells on their property: and 3) that Beck had breached a number of express and implied covenants including the covenant to reasonably develop the leaseholds. They asked the trial court to invalidate and declare the Leases void, and to quiet title in the encumbered real estate. No monetary damages were sought.

{¶12} In their second amended class action complaint the named plaintiffs sought certification of the class to be defined as "all landowners/Lessors of land in Monroe County, Ohio who were lessors under, or who are successors in interest of Lessors, under a standard form oil and gas lease with Beck Energy Corporation,

where Beck Energy has neither drilled nor prepared to drill a gas/oil well, nor included the property in a drilling unit within the time period set forth in paragraph 3 of the lease or thereafter."

{¶13} On November 9, 2011, Beck entered into a Purchase and Sale Agreement with XTO Energy, Inc., to sell the deep rights in the Beck leases, which covered oil and gas deposits below 3,860 feet, and on December 20, 2011, Beck assigned those rights to XTO. Beck retained an overriding royalty interest in the Leases, and, notably, agreed "to warrant and defend the title to the Assets hereby assigned unto Assignee against the claims of any party arising by, through, or under Assignor, but not otherwise."

{¶14} On November 30, 2011, Beck filed a motion to dismiss alleging that the named plaintiffs' claims must fail because the plaintiffs failed to provide Beck with prior written notice of breach prior to commencing the lawsuit. The named plaintiffs opposed the motion, arguing, inter alia, that because the lease was allegedly void at the time they filed suit, they were not required to provide Beck with notice or an opportunity to cure prior to bringing the action.

{¶15} On February 16, 2012, the named plaintiffs filed a motion for summary judgment. Therein, they argued that the Leases were void as against public policy and that Beck had breached express and implied covenants in the Leases, including the covenant to reasonably develop. In support of their motion, they attached, inter alia, affidavits of three of the named plaintiffs, along with assignments and bills of sale for the deep drilling rights for the Hustack, Hubbard and Majors Leases from Beck to Exxon Mobil Corporation c/o its affiliate XTO Energy, Inc. Beck filed a brief in opposition to summary judgment to which the named plaintiffs replied.

{¶16} On July 12, 2012, the trial court issued a lengthy decision on the pending motions. The trial court concluded that the Leases were perpetual in nature and therefore violate public policy, and that Beck breached the implied covenant to reasonably develop the land by failing to drill any wells on leasehold properties. For these reasons, the trial court determined the named plaintiffs were entitled to summary

judgment and denied Beck's motion to dismiss. The trial court ordered counsel for the named plaintiffs to submit a proposed entry journalizing the decision.

{¶17} In the meantime, on July 19, 2012, the named plaintiffs filed a motion for class action certification pursuant to Civ.R. 23(B)(2). The motion alleged that all prerequisites for class action certification had been met. *See* Civ.R. 23(A); Civ.R. 23(B)(2). The motion continued to state:

> * * * The Beck leases are void on their face as has already been held by this Court. Accordingly, the Plaintiffs are requesting that a class be certified *of all landowners in Ohio* who executed leases with Beck where Beck did not drill a well on their property. The Plaintiffs herein request a certification from this Court to proceed as a Class Action under Civ.R. 23(B)(2). The leases of the Plaintiffs herein have already been declared void against public policy, violative of implied covenants and forfeited.

(Emphasis added.)

{¶18} The class action certification motion was accompanied by a motion for leave to file a third amended class action complaint. Therein the named plaintiffs sought to expand the class definition to include property owners in all Ohio counties.

{¶19} Beck opposed the motion for class certification, first arguing that certification would be an unnecessary expenditure of court resources because the order granting injunctive or declaratory relief would automatically accrue to similarly situated landowners. Beck further asserted that the named plaintiffs failed to establish an identifiable class and that the proposed class definition lacked the requisite specificity. Finally, Beck contended that the representative parties and their counsel will not fairly and adequately protect the interests of the class.

{¶20} The named plaintiffs subsequently withdrew their motion for leave to file a third amended complaint on September 12, 2012. They filed an amended motion for class certification that same day which sought certification of a class consisting of only Monroe County landowners. Beck opposed the amended class certification motion,

arguing that class certification would be improper because a trial court must rule on a request for class certification prior to a decision on the merits so as not to violate the rule against one-way intervention.

**{¶21}** On July 31, 2012, before ruling on the class issues, the trial court issued a judgment entry granting the named plaintiffs' motion for summary judgment, and denying Beck's motion to dismiss. The judgment incorporated by reference the lengthy July 12, 2012 decision. This resulted in an appeal: Case No. 12MO6.

**{¶22}** On September 7, 2012, ten months after entering into the Purchase and Sale agreement for the deep rights in the Beck leases, and almost two months after summary judgment was granted to the Landowners, third-party XTO filed a motion to intervene as a party defendant. The Landowners opposed the motion, and on February 8, 2013, the trial court denied intervention. This spawned an appeal: Case No. 13MO2.

**{¶23}** On February 8, 2013, the trial court granted the motion for class certification. The trial court concluded that all prerequisites for class action certification under Civ.R. 23(A) and (B)(2) had been met. However, the entry did not specifically define the class. Beck appealed the class action certification judgment, which was assigned Case No. 13MO3.

**{¶24}** Pursuant to a limited remand from this court, on June 10, 2013, the trial court issued a judgment defining the class as follows:

> "All persons who are lessors of property in the State of Ohio, or who are successors in interest of said lessors, under a standard form oil and gas lease with Beck Energy Corporation, known as (G&T (83)", [sic] where Beck Energy Corporation has neither drilled nor prepared to drill a gas/oil well, nor included the property in a drilling unit, within the time period set forth in paragraph 3 of said Lease or thereafter."

**{¶25}** Beck challenged the trial court's definition of the class in a fourth appeal, which was assigned Case No. 13MO11. Meanwhile, the trial court denied the named

plaintiffs' motion for approval of notice to the class and to establish a method of service.

{¶26} On September 26, 2013, we granted Beck's motion for a stay pending appeal and its motion to toll the terms of the Leases as to Beck and both the named plaintiffs and the proposed defined class members, commencing on October 1, 2012, the date Beck Energy first filed a motion in the trial court to toll the terms of the oil and gas leases in the trial court, ruling that the tolling period would continue "during the pendency of all appeals in this Court, and in the event of a timely notice of appeal to the Ohio Supreme Court, until the Ohio Supreme Court accepts or declines jurisdiction. At the expiration of the tolling period, Beck Energy, and any successors and/or assigns shall have as much time to meet any and all obligations under the oil and gas lease(s) as they had as of October 1, 2012."

{¶27} We will first address the appeals filed by Beck: the class action issues raised in 13MO3 and 13MO11, and then the issues concerning the trial court's determination that the Leases are void ab initio raised in 12MO6. Finally, we will address the denial of XTO's motion to intervene raised in 13MO2.

### 13MO3 – Class Certification

{¶28} There are two separate appeals concerning class action issues. In Case No. 13MO3, Beck appeals the trial court's February 8, 2013 decision and order granting class action certification. In 13MO11, Beck appeals the trial court's June 10, 2013 order defining the class. Beck assigns four errors in 13MO3, but points out in its reply brief that assignments of error two and four concern issues that will be the subject of 13MO11.

{¶29} The second and fourth assignments of error in 13MO3 state respectively:

{¶30} "The trial court abused its discretion when it granted class certification where it failed to specify the means to determine class membership as required by Civ.R. 23(C)(3)."

{¶31} "The trial court abused its discretion when it failed to consider the Amended Motion for Class Certification and instead, granted class certification on a motion that was no longer pending before the trial court."

**{¶32}** These assignments of error are mooted by the trial court's June 10, 2013 order defining the class and therefore will not be addressed. But before turning to the merits of the first and third assignments of error in 13MO3 and then to the sole assignment of error presented by 13MO11, a discussion of general class action law in Ohio is warranted.

**General Class Action Law**

**{¶33}** "Class certification in Ohio is based upon Civ.R. 23, which is nearly identical to Fed.R.Civ.P. 23." *Lucio v. Safe Auto Ins. Co.*, 183 Ohio App.3d 849, 2009-Ohio-4816, 919 N.E.2d 260, ¶13 (7th Dist.). Accordingly, Ohio courts may look to federal court precedent concerning Fed.R.Civ.P. 23 when presented with class action issues based upon Civ.R. 23. *Stammco, L.L.C. v. United Tel. Co. of Ohio*, 136 Ohio St.3d 231, 2013-Ohio-3019, 994 N.E.2d 408, ¶18 ("federal law interpreting a federal rule, while not controlling, is persuasive in interpreting a similar Ohio rule."). It must be remembered that a class action is " 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only[.]' " *Cullen v. State Farm Mut. Auto. Ins. Co.*, 137 Ohio St.3d 373, 377, 2013-Ohio-4733, 999 N.E.2d 614, ¶11, quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The party seeking to maintain a class action bears the burden to " 'affirmatively demonstrate his compliance' with Rule 23," *Cullen* at ¶11, quoting *Comcast Corp. v. Behrend*, ------ U.S. ------, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013), quoting *Wal-Mart Stores, Inc. v. Dukes*, ------ U.S. ------, 131 S.Ct. 2541, 2551–2552, 180 L.Ed.2d 374 (2011).

**{¶34}** There are seven prerequisites plaintiffs must establish in order to certify a class action, and the failure to meet any one of them will defeat certification. *Stammco* at ¶19, ¶24. They are as follows:

> (1) an identifiable and unambiguous class must exist, (2) the named representatives of the class must be class members, (3) the class must be so numerous that joinder of all members of the class is impractical, (4) there must be questions of law or fact that are common to the class,

(5) the claims or defenses of the representative parties must be typical of the claims and defenses of the members of the class, (6) the representative parties must fairly and adequately protect the interests of the class, and (7) one of the three requirements of Civ.R. 23(B) must be satisfied.

*Stammco* at ¶19, citing *Warner v. Waste Mgt., Inc.*, 36 Ohio St.3d 91, 94-96, 521 N.E.2d 1091 (1988).

{¶35} With regard to the seventh prerequisite, the named plaintiffs requested declaratory judgment and quiet title relief, but no money damages, and sought certification pursuant to subsection (2). Civ.R. 23(B)(2) provides that class actions may be brought where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Civ.R. 23(B)(2). Additionally, courts have held that subsection (B)(2) contains two requirements: " '(1) the class action must seek primarily injunctive relief; and (2) the class must be cohesive.' " *Fowler v. Ohio Edison Co.*, 7th Dist. No. 07-JE-21, 2008-Ohio-6587, ¶64, quoting *Wilson v. Brush Wellman, Inc.,* 103 Ohio St.3d 538, 2004-Ohio-5847, 817 N.E.2d 59, ¶13.

{¶36} Class actions brought under Civ.R. 23(B)(2) differ significantly from a procedural perspective from those brought under Civ.R. 23(B)(3), which applies where the plaintiff seeks money damages and the trial court finds that class issues predominate and that a class action is the superior method for adjudicating the dispute. For example, Civ.R. 23(B)(3) class members are entitled to notice and have the opportunity to opt-out of the class, while Civ.R. 23(B)(2) class members do not enjoy those protections. *See Dukes* at 2558; Civ.R. 23(C)(2)-(3).

{¶37} To this end, the United States Supreme Court has explained:

The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them

unnecessary, but because it considers them unnecessary to a (b)(2) class. When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. * * * Similarly, (b)(2) does not require that class members be given notice and opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause.

*Dukes*, 131 S.Ct. at 2558-2559.

**{¶38}** With regard to the timing of a class certification ruling, Civ.R. 23(C)(1) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." (Emphasis added.)

**{¶39}** Finally, regarding the standard of review, the "trial court's decision to certify a class pursuant to Civ.R. 23 is reviewed for abuse of discretion." *Lucio* at ¶13. "An abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *Downie v. Montgomery*, 7th Dist. No. 12 CO 43, 2013-Ohio-5552, ¶50. The trial court's discretion with regard to class certifications has been described as broad. *Marks v. C.P. Chem. Co.*, 31 Ohio St.3d 200, 201, 509 N.E.2d 1249. Further, " '[a] finding of abuse of discretion, particularly if the trial court has refused to certify, should be made cautiously.' " *Stammco* at ¶25, quoting *Marks v. C.P. Chem. Co.* at 201, 509 N.E.2d 1249. At the same time, a trial court's discretion in certifying a class is not unfettered; it is restrained by the framework set forth in Civ.R. 23. *Lucio* at ¶14.

## Timing of Class Certification

{¶40} In its first assignment of error in 13MO3, Beck asserts:

{¶41} "The trial court abused its discretion when it granted Appellees' motion for class certification where the rigorous analysis mandated by Civ.R. 23 establishes Appellees' motion and the trial court's ruling were untimely under Ohio law."

{¶42} Turning to a preliminary matter, the Landowners claim Beck waived any right it otherwise may have had to a ruling on class certification before pronouncement of judgment on the merits by filing a motion to dismiss, and by participating without objection in scheduling conferences and in the determination of the Landowners' motion for summary judgment. This argument is meritless for several reasons.

{¶43} First, the burden falls on the plaintiffs to move for class certification and thus it is baseless to fault Beck as the defendant for failing to insist on certification sooner. Second, Beck did not expressly acquiesce in the timing of class certification; in its memo in opposition to the amended motion for class certification, Beck squarely challenged the timing of class certification. Third, Beck's motion to dismiss did not call into question the merits of the case, rather it raised only the narrow procedural issue that the named plaintiffs failed to provide Beck with prior written notice of breach before commencing the lawsuit.

{¶44} Turning to Beck's numerous arguments relating to the timing of class certification, Beck first contends that the named plaintiffs' failure to move for class certification sooner demonstrates that they did not adequately represent the class. Beck has waived this argument because it failed to raise it at the trial court level. *See, e.g., Maust v. Meyers Prods., Inc.*, 64 Ohio App.3d 310, 313, 581 N.E.2d 589 (1989) (failure to raise an issue in the trial court waives a litigant's right to raise that issue on appeal). In neither Beck's brief in opposition to the first or amended motion for class certification did it assert precisely that the named plaintiffs' failure to move for class certification sooner demonstrates they were inadequate class representatives.

{¶45} Beck's chief argument on appeal with regard to timing is that the trial court's actions violate the so-called rule against one-way intervention. The origins of

this rule stem from the effects of former versions of Rule 23, as aptly explained by the Seventh Circuit:

One of the complaints about the old Rule 23 was that it allowed courts to entertain what were called "spurious class actions"--actions for damages in which a decision for or against one member of the class did not inevitably entail the same result for all. One party could style the case a "class action", but the missing parties would not be bound. A victory by the plaintiff would be followed by an opportunity for other members of the class to intervene and claim the spoils; a loss by the plaintiff would not bind the other members of the class. (It would not be in their interest to intervene in a lost cause, and they could not be bound by a judgment to which they were not parties. *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940).) So the defendant could win only against the named plaintiff and might face additional suits by other members of the class, but it could lose against all members of the class. This came to be known as "one-way intervention", which had few supporters. A principal purpose of the 1966 revision of Rule 23 was to end "one-way intervention". See the Advisory Committee's note to new Rule 23(c)(3), and, e.g., C. Wright, A. Miller & M. Kane, 7B Federal Practice and Procedure Sec. 1789 at 266-67 (2d ed. 1986). See also H. Kalven & M. Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684 (1941).

The drafters of new Rule 23 assumed that only parties could take advantage of a favorable judgment. Given that assumption, it was a simple matter to end one-way intervention. First, new Rule 23(b)(3) eliminated the "spurious" class suit and allowed the prosecution of damages actions as class suits with preclusive effects. Second, new Rule 23(c)(3) required the judgment in a Rule 23(b)(3) class action to define all members of the class. These members of the class were to be

treated as full-fledged parties to the case, with full advantage of a favorable judgment and the full detriments of an unfavorable judgment. Third, new Rule 23(c)(1) required the district courts to decide whether a case could proceed as a class action "as soon as practicable" after it was filed. The prompt decision on certification would both fix the identities of the parties to the suit and prevent the absent class members from waiting to see how things turned out before deciding what to do. Finally, new Rule 23(c)(2) allowed members of a 23(b)(3) class action to opt out immediately after the certification in accordance with 23(c)(1). So a person's decision whether to be bound by the judgment--like the court's decision whether to certify the class--would come well in advance of the decision on the merits. Under the scheme of the revised Rule 23, a member of the class must cast his lot at the beginning of the suit and all parties are bound, for good or ill, by the results. Someone who opted out could take his chances separately, but the separate suit would proceed as if the class action had never been filed. As the Advisory Committee put it: "Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or a nonclass action, and in the former case the judgment, whether or not favorable, will include the class".

*Premier Elec. Const. Co. v. National Elec. Contractors Assn., Inc.*, 814 F.2d 358, 362 (7th Cir.1987)

**{¶46}** Beck asserts that the trial court's decision to certify the class after it had granted summary judgment in favor of the Landowners violates the rule against one-way intervention. The Landowners counter that the rule against one-way intervention does not apply to Civ.R. 23(B)(2) actions because members of a Civ.R. 23(B)(2) class have no right to notice nor the ability to opt-out of the class.

**{¶47}** Beck relies heavily on an older case from the First District, *Bass v. Ohio Med. Indemnity Inc.,* 1st Dist. No. C-76273, 1977 WL 199736 (Aug. 3, 1977), and the

federal cases cited therein. In *Bass*, the court determined that the trial court had erred by failing to consider class certification until after a decision on the merits.[1] The plaintiff had filed a complaint on his own behalf and on behalf of others similarly situated. The defendant moved to dismiss the class-action allegations, and the trial court, following a hearing, denied that motion. It did not consider class certification again until after a trial that resulted in judgment in the plaintiff's favor. Following judgment, the plaintiff, for the first time, moved for class certification pursuant to Civ.R. 23(B)(2) (requesting only injunctive relief). The trial court denied class certification, and the plaintiff appealed.

**{¶48}** The First District, citing case law regarding the rule against one-way intervention, concluded that the trial court erred by failing to address class certification prior to issuing a judgment on the merits in favor of the named plaintiff: "[T]hose courts ruling on the question consistently have held that certification of a suit as a class action must precede or, at the very least, accompany the court's decision on the merits of the action." *Bass* at *2, citing *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Larionoff v. United States*, 533 F.2d 1167 (D.C.Cir.1976); *Jiminez v. Weinberger*, 523 F.2d 689 (7th Cir.1975); *Peritz v. Liberty Loan Corp.*, 523 F.2d 349 (7th Cir.1974); *Katz v. Carte Blanche* Corp, 496 F.2d 747 (3d Cir.1974); *Glodgett v. Betit*, 368 F. Supp. 211 (D.Vt.1973).

**{¶49}** Some of the cases cited above in *Bass*, however, involve different procedural postures and/or do not squarely hold that class certification must always precede or accompany a merit decision in 23(B)(2) cases. For example, *American Pipe & Construction* discussed the rule against one-way intervention, 414 U.S. at 547, but ultimately that case dealt with the commencement of the applicable statute of limitations for asserted class members. *Id.* at 552-553 (holding that "at least where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable,' the commencement of the original class suit tolls the running of the statute for all purported members of the

---

[1] Ultimately the court did not reverse the error because it found the plaintiff-appellant had either waived the issue for purposes of appeal or invited the error. *Bass* at *4.

class who make timely motions to intervene after the court has found the suit inappropriate for class action status.") Some of the cases concededly involved 23(B)(2) classes, yet the courts failed to note the distinctions between 23(B)(2) and 23(B)(3) classes.

**{¶50}** The Landowners contend that *Bass*, which appears to be the only Ohio case addressing the issue, and those cases upon which it relies, are no longer good law and that the rule against one-way intervention does not apply to 23(B)(2) class actions. They cite a more recent Sixth Circuit case which concluded that there is "no support for applying the prohibition on one-way intervention to Rule 23(b)(2) class certifications, in which class members may not opt out and therefore make no decision about whether to intervene." *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 433 (6th Cir.2012), citing *Paxton v. Union Natl. Bank*, 688 F.2d 552, 558–59 (8th Cir.1982).

**{¶51}** In *Gooch*, the trial court certified the class after granting a preliminary injunction to the plaintiffs in a 23(B)(2) suit. While Beck is correct that the *Gooch* court's conclusion that no error occurred was based in part on its determination that a decision to grant a preliminary injunction was not a decision on the merits, the court alternatively concluded that the rule against one-way intervention did not apply to Rule 23(B)(2) class certifications. *Id.*

**{¶52}** Other federal courts have likewise stated that the rule against one-way intervention does not apply to Civ.R. 23(B)(2) class certifications. In *Williams v. Lane*, 129 F.R.D. 636, 640-41 (N.D.Ill.1990), the court noted that where a plaintiff class seeks only declaratory or injunctive relief, certification under Rule 23(b)(2) "readily leads to binding all members of the class to both favorable and unfavorable judgments." The overriding concern over one-way intervention "legitimately arises only where monetary relief is the sole relief sought, not where * * * injunctive relief was and is so importantly at stake." *Id.* at 642.

**{¶53}** In *Paxton*, the Eighth Circuit refused to apply the rule against one-way intervention where the trial court withheld a decision on a 23(B)(2) class certification until after a full trial on the merits, reasoning that

The prejudice inherent in delaying the certification determination until after trial has been thoroughly explored in the context of litigation under subdivision (3) of Rule 23(b). The courts' concern in Rule 23(b)(3) suits has been to prevent "one-way intervention[,]" i.e., to protect defendants from putative class members who can "opt-out" of an unfavorable decision rendered simultaneously with class certification but can choose to be bound by a favorable decision. Rule 23(b)(2) suits * * * from which class members cannot "opt-out," do not present the same problem.

*Paxton* at 558-59. *See also* Civ.R. 23(C)(2), (3) (only Civ.R. 23(B)(3) class members may request exclusion from the class).

**{¶54}** As an issue of first impression in this district, we are more persuaded by the *Gooch* and *Paxton* cases, and hold that the rule against one-way intervention does not apply to Civ.R. 23(B)(2) classes.

**{¶55}** This leaves us to consider the language of Civ.R. 23(C)(1) which provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

**{¶56}** The use of the term practicable leaves some discretion with the trial court. Thus, we read this rule as generally requiring class certification prior to a ruling on the merits in many, but not all circumstances, for example, not in Civ.R. 23(B)(2) classes. Although we might have managed this case differently, as borne out by the myriad of appeals and judgment entries this case management has generated, ultimately we cannot conclude the trial court abused its discretion, given the standard of review that we generally defer to the trial court's broad discretion in managing class actions. *See generally Marks, supra*, 31 Ohio St.3d at 201.

{¶57} Additionally, even though the rule against one-way intervention does not apply in 23(B)(2) classes, we recognize that determining the merits prior to certifying a 23(B)(2) class may, in some circumstances, be "inappropriate for reasons 'of judicial economy, and of fairness to both sides[.]' " *Gooch, supra* at 559, quoting *Paxton, supra*, at 558-559, quoting *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 275 (4th Cir.1980). However, there must be a showing of prejudice. *Paxton* at 559.

{¶58} Here, Beck has failed to demonstrate how it was prejudiced by the timing, especially in light of this court's orders granting a stay of the trial court's judgments on appeal and equitable tolling of the terms of all the Landowners' Leases. Moreover, this case is similar to *Paxton,* where no prejudice was found. There, as here, the "the defendant thereupon fully presented its defense as to all the class and individual claims [and the] plaintiffs generally proceeded on a class-wide basis as well." *Paxton* at 559. The *Paxton* court found these factors demonstrated that neither party could assert prejudice from the delay in certification. *Id.*

{¶59} While not the better practice, the trial court did not abuse its discretion in certifying a Civ.R. 23(B)(2) class after ruling on the merits. There was no prayer for monetary damages, only declaratory and quiet title relief were sought, and prospective class members under subsection (B)(2) are not entitled to notice and cannot opt-out of the class. Accordingly, Beck's first assignment of error in 13MO3 is meritless.

### Failure to Conduct a Class Action Certification Hearing

{¶60} In its third assignment of error in 13MO3, Beck asserts:

{¶61} "The trial court abused its discretion when it failed to conduct an evidentiary hearing prior to granting class action certification."

{¶62} The Civil Rules themselves are silent as to whether a hearing is required prior to class certification. *See* Civ.R. 23; *Ritt v. Billy Blanks Ents.*, 171 Ohio App.3d 204, 2007-Ohio-1695, 870 N.E.2d 212 (8th Dist.) Although the Ohio Supreme Court has stated in passing that "typically there is a hearing," on class certification, *Warner*, 36 Ohio St.3d at 94, the Court also recognized that a hearing is not required in all cases. *Id.* at 98. Further, this court has concluded, "in many cases, no evidentiary hearing is needed in order for a court to certify a class, and class certification may be

granted on the basis of the pleadings alone." *Lucio v. Safe Auto Ins. Co.*, 183 Ohio App.3d 849, 2009-Ohio-4816, 919 N.E.2d 260, ¶15, citing *Warner* at 98; *Gottlieb v. S. Euclid*, 157 Ohio App.3d 250, 2004-Ohio-2705, 810 N.E.2d 970 (8th Dist.); *Franks v. Kroger Co.* 649 F.2d 1216 (6th Cir.1981). "An evidentiary hearing is not required in cases where the pleadings in a class action are so clear that a trial court may find by a preponderance of the evidence that certification is or is not proper." *Ritt* at ¶18. " 'As long as the trial court provides a sufficient opportunity for a factual development so as to permit a meaningful determination as to whether or not a cause of action should be certified as a class action, the trial court need not conduct a hearing on the certification question. * * *' " *Id.* at ¶19, quoting *Clark v. Pfizer, Inc.,* 6th Dist. No. S–84–7, 1984 WL 7932, *5 (July 13, 1984).

{¶63} Therefore, a trial court has discretion whether to hold a class certification hearing and "it follows that if the court had sufficient information before it to rule on certification, it did not abuse its discretion by failing to hold a hearing." *Ritt* at ¶21. *See also Lasson v. Coleman*, 2d Dist. No. 21524, 2007-Ohio-3443, ¶15-17.

{¶64} Beck asserts the record was not developed enough with regard to class certification and therefore a hearing was required. We disagree. Based upon a review of the trial court's detailed February 8, 2013 decision, which noted, inter alia, the same Form G&T 83 Lease was used between Beck and all the Landowners and no monetary damages were sought, class certification was a fairly straightforward matter. There was sufficient opportunity for factual development to permit a meaningful determination as to whether to certify a class action.

{¶65} Prior to ruling on class certification, the trial court ruled upon Beck's motion to dismiss and/or change venue and the Landowners' motion for summary judgment. The trial court had before it the Form G&T 83 Leases at issue, the purchase and sale agreement and assignment of the deep rights under the leases between Beck and XTO, Beck's motion to dismiss and the Landowners' opposition response, and the Landowners' and Beck's filings regarding the Landowner's motion for summary judgment. Further, the only relief sought was a declaration that the form lease is void and the quieting of title to lands encumbered by that particular form lease.

{¶66} Membership in the class is based upon whether an individual's land is encumbered by that form lease, and whether any drilling has been carried out on the individual's land. There are no disputes regarding the pertinent evidence, and the trial court's conclusion on each one of the class prerequisites was based upon information in the record. Moreover, neither party requested a hearing on class certification.

{¶67} Based on all of the above, the trial court did not abuse its discretion by failing to hold a hearing on class certification. Accordingly, Beck's third assignment of error in 13MO3 is meritless.

### 13MO11 – Class Definition

{¶68} In its sole assignment of error in 13MO11, Beck asserts:

{¶69} "The trial court abused its discretion when it adopted a class description that is inconsistent with Appellees' Second Amended Complaint and Appellees' Motion for Class Action Certification."

{¶70} Beck challenges the trial court decision to certify a class consisting of Ohio lessors instead of one comprised of Monroe County lessors as requested in the second amended class action complaint and amended motion for class action certification. In other words, Beck challenges the trial court's authority to modify the definition of the class set forth in the pending pleading and motion.

{¶71} To briefly recap the procedural history, both the first and second amended class action complaints requested that a class of Monroe County lessors be certified. The initial motion for class action certification did request a class of Ohio lessors, however, in the amended motion, they changed their request to include Monroe County lessors. Because the trial court's February 8, 2013 class action certification decision was ambiguous regarding the class definition, this court issued a limited remand for the trial court to define the class. Thereafter, the Landowners' filed a motion in aid of appeal requesting that the class include all Ohio lessors.

{¶72} A court's description of a class must be unambiguous and such that all class plaintiffs are sufficiently identifiable. *Warner v. Waste Mgt., Inc.*, 36 Ohio St.3d 91, 96, 521 N.E.2d 1091 (1988). A class description is sufficiently definite if it is "administratively feasible for the court to determine whether a particular individual is a

member." *Hamilton v. Ohio Sav. Ban*k, 82 Ohio St.3d 67, 71-72, 694 N.E.2d 442, 448 (1998).

**{¶73}** The trial court has wide discretion in defining the certified class, and has the power to sua sponte modify a class description that was proposed by a party. *Ritt, supra,* at ¶19-20 (citing *Warner* and concluding that trial court should have modified the class). *See also Baughman v. State Farm Mut. Auto. Ins. Co.*, 88 Ohio St.3d 480, 483-484, 727 N.E.2d 1265 (2000) (where Ohio Supreme Court sua sponte modified the class description). The Sixth Circuit has noted that this broad discretion stems from the fact that "courts must be vigilant to ensure that a certified class is properly constituted." *Powers v. Hamilton Cty. Pub. Defender Comm*, 501 F.3d 592, 619 (6th Cir.2007). In *Powers*, the appellate court concluded that the trial court's multiple amendments to the class description "merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed." *Id.*, citing *Schorsch v. Hewlett–Packard Co.*, 417 F.3d 748, 750 (7th Cir.2005) (noting that "[l]itigants and judges regularly modify class definitions"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir.2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision.").

**{¶74}** Resolution of this issue turns on the trial court's broad discretion to manage class actions. *See, e.g., Hamilton, supra*, 82 Ohio St.3d at 70 (emphasizing the trial court's broad discretion in class certification matters and noting that such discretion is "grounded * * * in the trial court's special expertise and familiarity with case-management problems and its inherent power to manage its own docket."); *Marks v. C.P. Chem. Co., Inc.*, 31 Ohio St.3d 200, 201, 509 N.E.2d 1249, 1252 (1987) ("[d]ue deference must be given to the trial court's decision. A trial court which routinely handles case-management problems is in the best position to analyze the difficulties which can be anticipated in litigation of class actions. It is at the trial level that decisions as to class definition and the scope of questions to be treated as class issues should be made.")

**{¶75}** Here, the Landowners did submit a proposed modification while the case was on remand from this court, wherein they requested a state-wide class. Second,

the class certified by the trial court is unambiguous and such that all class plaintiffs are easily identifiable. Third, the trial court cited valid reasons in support of its decision to certify a state-wide class:

> This is the class delineation that best serves the interests of finality, judicial economy and justice. Determination of the members of this class will not be difficult. This is a clear and unambiguous class definition. It will resolve these issues once and for all and prevent years of numerous and protracted litigation.

{¶76} The trial court did not abuse its discretion by defining the class more broadly than was originally requested via the pending pleading and class certification motion. Specifically, the trial court did not abuse its discretion by defining the class as all Ohio lessors who executed a Form G&T 83 Lease with Beck, where Beck had neither drilled nor prepared to drill a well, nor included the property in a drilling unit. Accordingly, Beck's sole assignment of error in 13MO11 is meritless.

## 12MO6 – Summary Judgment

{¶77} Beck assigns six errors, all of which challenge the trial court's decision granting summary judgment in favor of the Landowners. For ease of analysis, the assignments of error will be discussed together and/or out of order.

{¶78} When reviewing a trial court's decision to grant summary judgment, an appellate court applies the same standard used by the trial court and, therefore, engages in de novo review. *Parenti v. Goodyear Tire & Rubber Co.*, 66 Ohio App.3d 826, 829, 586 N.E.2d 1121 (9th Dist.1990). Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the nonmovant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000). Further, "[t]he construction of written contracts and instruments of conveyance is a matter of law." *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d

146 (1978), paragraph one of the syllabus, quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). Thus, a de novo review applies as well.

### No-term/Perpetual Leases

{¶79} In its first and fourth assignments of error in 12MO6, Beck asserts:

{¶80} "The trial court erred when it concluded the leases are subject to perpetual renewal and therefore void ab initio"

{¶81} "The trial court erred when it concluded the leases were "no-term" leases."

{¶82} Beck challenges the trial court's decision to void the Lease merely because the court deemed it to be a perpetual lease. Indeed, although perpetual leases are disfavored by the law, courts have not found them to be per se illegal or void from their inception. *See Myers v. East Ohio Gas*, 51 Ohio St.2d 121, 364 N.E.2d 1369 (1977); *Hallock v. Kintzler,* 142 Ohio St. 287, 51 N.E.2d 905 (1943); *Central Ohio Natural Gas & Fuel Co. v. Eckert*, 70 Ohio St. 127, 71 N.E. 281 (1904). That said, we must first determine whether the Leases are in fact perpetual.

{¶83} Beck challenges the trial court's ruling that the Leases were no-term and perpetual in nature, and therefore violative of Ohio public policy. Beck asserts the trial court misinterpreted the following Lease provisions to reach that conclusion:

> 2. This lease shall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of ten years and so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil or gas and as provided in Paragraph 7 [the dry hole clause].

> 3. This lease, however, shall become null and void and all rights of either party hereunder shall cease and terminate unless, within 12 months from the date hereof, a well shall be commenced on the premises, or unless the Lessee shall thereafter pay a delay rental of

_____ each year, payments to be made quarterly until the commencement of a well. A well shall be deemed commenced when preparations for drilling have commenced.

**{¶84}** The trial court concluded that these two provisions, when read together, allow Beck to extend the leases in perpetuity, in violation of Ohio public policy, "either by making nominal delay rental payments pursuant to paragraph 3 or by determining in its own judgment that the premises are capable of producing oil or gas in paying quantities pursuant to paragraph 2."

**{¶85}** Beck asserts that the trial court's interpretation of the Lease provisions runs counter to years of established oil and gas jurisprudence in Ohio and nationwide. We agree; the trial court's reasoning is problematic for four main reasons.

**{¶86}** First, the lease is not a no-term lease. The habendum clause of the Lease contains a primary and secondary term: "This lease shall continue in force * * * for a term of ten years and as much longer thereafter as oil or gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee * * *."

**{¶87}** As stated in _Am. Energy Serv. v. Lekan,_ 75 Ohio App.3d 205, 598 N.E.2d 1315 (5th Dist.1992), the habendum clause is "two tiered. The first tier, or primary term, is of definite duration * * *. The second tier is of indefinite duration and operates to extend the Lessee's rights under the lease so long as the conditions of the secondary term are met." _Id._ at 212 (quoting and affirming in entirety the decision of the trial court).

**{¶88}** For example, _Gardner v. Oxford Oil Co._, 2013-Ohio-5885, 7 N.E.3d 510 (7th Dist.), involved a habendum clause that stated: "the lease will run for '5 years and so much longer thereafter as oil, gas or their constituents are produced in paying quantities thereon, or operations are maintained on' all or part of the land." _Id._ at ¶4. We concluded that the "primary term" of the lease was five years, which had expired, and that "[t]he habendum clause of the lease also provides for a secondary term, that the lease will run for 'and so much longer thereafter as oil, gas or their constituents are

produced in paying quantities thereon, or operations are maintained on' all or part of the land." *Id.* at ¶27.

{¶89} Likewise in *Swallie v. Rousenberg*, 190 Ohio App.3d 473, 2010-Ohio-4573, 942 N.E.2d 1109 (7th Dist), the habendum clause provided that the lease had: "a term of twenty (20) years and so much longer thereafter as oil, gas, or their constituents are produced in paying quantities thereon." *Id.* at ¶5-6. In interpreting this language, this court concluded that "the primary term of the [1919] lease expired" after the first twenty years, "in 1939." *Id.* at ¶63. The court then acknowledged that "[t]he lease term continued under the secondary term until the well ceased producing in paying quantities * * *." *Id.* There was no requirement in the lease that the lessee had any drilling obligations during the initial primary term. *Id.* at ¶62.

{¶90} Applying these principles to the instant case, the primary term of the Lease is ten years and the secondary term is "so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil or gas and as provided in Paragraph 7 [the dry hole clause]." The Form G&T 83 Lease is not a no-term lease; it has two distinct terms.

{¶91} Second, courts have held that delay rental provisions in oil and gas leases –also known as drilling and rental clauses– such as the one contained in paragraph 3 of the Lease, only apply during the *primary term* of the lease.

{¶92} In *Northwestern Ohio Natural Gas Co. v. City of Tiffin*, 59 Ohio St. 420, 54 N.E. 77 (1899), the lease at issue was for "the term of five years...and as much longer as oil and gas is produced or found in paying quantities," and it also required the lessee to "complete a well * * * within nine months" or pay "for such delay a yearly rental." *Id.* at 424. The Supreme Court of Ohio concluded that "such a lease * * * expires at the end of the specified term, unless within that time oil or gas is obtained from the land in the designated quantities." *Id.*, at paragraph two of the syllabus. "Upon payment of the [delay] rental, [lessee's] right to complete the well continued for the specified term of five years, *but no longer.*" (Emphasis added.) *Id.* at 442-443.

**{¶93}** And in *Brown v. Fowler,* 65 Ohio St. 507, 522, 63 N.E. 76 (1902), the lease had a primary term of two years and secondary term of "as long thereafter as oil or gas is found in paying quantities thereon," but not to exceed 25 years from the date of the lease agreement. *Id.* at 521. It also contained a provision that required the lessee to drill within twelve months or pay a delay rental. The Court concluded that "[t]his [delay rental] clause cannot have the effect, in any event, to extend the lease beyond the two years definitely and certainly fixed in the habendum clause." *Id.* at 523. In other words, the delay rental payment cannot extend the lease beyond the primary term.

**{¶94}** As a federal district court has explained much more recently, provisions in oil and gas leases "obligating the lessor to pay a rental or develop the leasehold" are "understood to be operative during the primary term." *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759, 786 (W.D.Pa.2004). The court elaborated on the history of the delay rental clause and how that played a role in its meaning:

> When the fixed term lease came into general use in the 1890s.* * * lessees argued that such leases could be extended beyond the fixed term by the mere payment of the fixed rental referenced in the drilling clause. * * * The courts * * * rejected such a construction as being "contrary to the intentions of the parties to so word a habendum clause that the lease must terminate within a definite time in the absence of production, and then in the next clause destroy that provision by another permitting the lease to run indefinitely [without production] by the payment of a nominal delay rental."

*Id.* at 790, quoting 2 Summers, *The Law of Oil and Gas*, Section 290.

**{¶95}** The trial court here primarily relied on *Hite v. Falcon Partners,* 13 A.3d 942, 947 (Pa.Super.2011), a Pennsylvania appellate court case, in reaching the opposite conclusion. However, *Hite* is factually distinguishable for a number of reasons. In *Hite,* the secondary term of the habendum clause expressly permitted the lease to continue in perpetuity as long as a delay rental was paid:

3. Term. Lessee has the right to enter upon the Property to drill for oil and gas at any time withinone [sic] (1) year from the date hereof and as long thereafter as oil or gas or either of them is produced from the Property, or as operations continue for the production of oil or gas, or as Lessee shall continue to pay Lessors two ($2.00) dollars per acre as delayed rentals, or until all oil and gas has been removed from the Property, whichever shall last occur. Id. at Paragraph 3.1.

*Hite* at 944.

**{¶96}** However, the *Hite* court declined to enforce the provision so as to permit the lessee to defer production indefinitely as long as the rental was paid. The court only allowed the delay rental provision to defer production during the primary term:

[D]elay rentals function to relieve the lessee of the obligation to develop the leasehold during the primary term of the lease. Thus, Paragraph 3 of the leases currently at issue sets forth a primary term of one year, and requires a two dollar delay rental, paid annually. As such, a single two dollar delay rental payment relieved [the lessee] of any obligation to develop the leasehold during the one year primary term. Once that one year primary term expired, however, the mere payment of delay rentals alone did not preserve [the lessee's] drilling rights.

*Id.* at 948.

**{¶97}** Importantly, when the lessors filed suit in *Hite* the primary term of the leases at issue had long since expired, no production had occurred and the lessees contended that they were not obligated to drill so long as they paid the delay rental. *Id.* at 944-945, 948. By contrast, the Form G&T 83 Leases here were still within their primary term at the time the trial court declared them unenforceable. Secondly, unlike the leases in *Hite*, the delay rental provision here was set forth separately from the secondary term of the habendum clause. Finally, unlike the *Hite* lessees, Beck is not

contending that the Lease permits it to defer drilling indefinitely so long as it pays the delay rental in paragraph 3 of the Lease.

**{¶98}** *Hite* actually supports Beck's position more than the Landowners insofar as the Pennsylvania court recognized the long-standing view that delay-rental clauses—which were developed to offset the harsh requirement that development had to occur immediately upon the signing of the lease—apply only during the primary term of the lease and do not permit a lessee to defer commencement of a well beyond the primary term. *Hite* at 947-948.

**{¶99}** Thus, the trial court incorrectly concluded that Beck could extend the Lease in perpetuity by making a nominal delay rental payment. Under established case law, once the primary term of the Lease expires, the delay rental provision is no longer applicable. In order for the Lease to continue into the secondary term, "oil or gas or their constituents [must be] produced or [must be] capable of being produced on the premises in paying quantities, in the judgment of the Lessee * * *."

**{¶100}** Turning to the third issue with the trial court's decision—its interpretation of the phrase capable of production—similar language in a habendum clause has been read as referring to whether a *well* is capable of producing, *not whether the land* is capable of producing. *Morrison v. Petro Eval. Serv., Inc.*, 5th Dist. No. 2004 CA 0004, 2005-Ohio-5640, ¶34-35, 39-40 (where a lease had a definite primary term and continued "as long thereafter" as "oil or gas is produced or is capable of being produced from the premises," the court held that "a well is capable of production if it is capable of producing in paying quantities without additional repairs or equipment"), quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 558 (Tex.2003); *Hunthauser Holdings, LLC v. Loesch*, D.Kan. No. 00-1154-MLB, 2003 WL 21981961 (June 10, 2003) (where lease lasted for three years and as long thereafter as oil, gas or any of the products covered by the lease is or can be produced, the court proceeded as if the clause refers to a well that has produced or is capable of producing); *Anadarko Petroleum Corp., supra* (habendum clause stating the lease lasts as long as gas is or can be produced refers to whether a well is producing or can

produce). In other words, oil and gas is not capable of being produced if no well exists.

{¶101} Here, the secondary term of the habendum clause does not allow an extension merely because the *land* is capable of production. The Landowners are incorrect that the Leases require no development activity whatsoever, ever, and may be extended indefinitely. The trial court incorrectly concluded that Beck could extend the Lease in perpetuity by interpreting the phrase "capable of production," in the secondary term of the habendum clause to mean the *land* is capable of producing. Instead, case law has interpreted the phrase as referring to whether a *well* is capable of producing. This interpretation presupposes that a well was drilled and began producing during the primary term of the lease, and continued producing into the secondary term. The secondary term would then continue until such time as the well was no longer capable of producing.

{¶102} Fourth and finally, the trial court incorrectly reasoned that the addition of the language "in the judgment of Lessee" to the secondary term of the habendum clause, permits the Lease to continue in perpetuity at Beck's sole discretion. The full portion of the habendum clause reads: "are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee." The Landowners and the trial court over-parsed the phrase. The phrase does leave it to the judgment of the Lessee to determine whether a well is in fact or capable of *producing in paying quantities.* It would be contrary to the joint economic interest of both a landowner and the lessee to continue drilling if it was no longer financially feasible. Under these conditions, the lease would end and the lessee's interest in the mineral rights would expire; it would not continue in perpetuity. Further, clauses dealing with paying quantities have not been invalidated or read as making an entire lease void ab initio. They do not necessarily allow the lessee to arbitrarily determine whether a well is capable of production.

{¶103} Rather, courts generally impose a good faith standard on the paying quantities requirement, with or without this lease language. *See, e.g., T.W. Phillips Gas and Oil Co. v. Jedlicka*, 615 Pa. 199, 216-224, 42 A.3d 261, fn. 15 (2012); *Cotton*

*v. Upham Gas Co.*, 5th Dist. No. 86CA20, 1987 WL 8741, *1 (Mar. 6, 1987) ("As between lessor and lessee, the construction of the phrase 'paying quantities' must be from the standpoint of the lessee and his 'good faith judgment' that production is in paying quantities must prevail."); *Weisant v. Follett*, 17 Ohio App. 371 (7th Dist.1922) (reviewing cases in various states for propositions such as: "The lessee, acting in good faith and upon his honest judgment, not an arbitrary judgment * * *"; "His judgment, when bona fide, is entitled to great weight in determining whether the gas is in fact produced in paying quantities"; "the lessee is the sole judge on this question, and as long as he can make a profit therefrom, he will be permitted to do so"; and "largely left to his good judgment").

**{¶104}** For all of these reasons, the trial court erred in determining that the leases were no-term and perpetual in nature, and therefore void ab initio as against public policy. The Lease provided for a primary term of 10 years within which to commence drilling. Only then would a secondary term commence, and continue only so long as there is an established oil or gas well that is actually producing or capable of producing in paying quantities. Accordingly, Beck's first and fourth assignments of error in 12MO6 are meritorious.

### Implied Covenants

**{¶105}** In its second, third and sixth assignments of error in 12MO6 Beck asserts, respectively:

**{¶106}** "The trial court erred when it concluded Appellant's leases were subject to implied covenants."

**{¶107}** "The trial court erred when it refused to enforce the 30-day notice provision."

**{¶108}** "The trial court erred when it found a breach of the covenant to develop."

**{¶109}** In addition to invalidating the Leases because it believed them to be no-term and perpetual in nature, the trial court also concluded that they were subject to the implied covenants and that Beck had breached the implied covenant to

reasonably develop. Despite finding a breach, the trial court refused to enforce a Lease clause that granted Beck 30 days to cure any alleged breach.

{¶110} First and foremost, the trial court erred in its conclusion that the Leases were subject to implied covenants, relying on the Supreme Court's decision in *Ionno, supra, 2* Ohio St.3d 131. In that case, the 1960 coal and clay lease provided for a royalty on the product or a minimum rent payment of $300 per year for the first two years and $600 per year thereafter. By 1979, there was still no mining activity, the lessors refused to accept that year's payment, and the lessors sued seeking forfeiture and cancellation of the mineral lease for reasons of nonperformance and failure of consideration. The issue before the Supreme Court was whether the lease should be forfeited for breach of an implied duty to reasonably develop the leased premises where the lease contains no time period for commencement of operations. *Id.* at 132.

{¶111} The Supreme Court reiterated the general principle that absent express provisions to the contrary, a mineral lease includes an implied covenant to reasonably develop the land. *Id.* at 132-133, citing *Beer v. Griffith*, 61 Ohio St.2d 119, 399 N.E.2d 1227, at paragraph of syllabus (1980) and *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 127, 48 N.E. 502 (1897). "Thus, where a lease fails to contain any specific reference to the timeliness of development, the law will infer a duty to operate with reasonable diligence." *Id.* at 133.

{¶112} The Court then addressed whether the annual rental removed any duty to develop with diligence. The Court concluded that *because the rental was to be offset by any coal or clay produced,* the contract manifestly contained an implied covenant on the part of the lessees that they will work the land with ordinary diligence so that lessors may secure the actual consideration for the lease being the payment of a royalty on mined minerals. *Id.* at 133-134. The Court continued:

> The fact that the lessees have continued to make annual payments for a
> period of over eighteen years does not alter their responsibility to
> develop the land within a reasonable time. The questions of working
> diligently and of paying rent or royalties are entirely separate matters. An

annual advance payment which is credited against future royalties cannot be viewed as a substitute for timely development. To hold otherwise would be to reward mere speculation without development, effort, or expenditure on the part of the lessees. It would allow a lessee to encumber a lessor's property in perpetuity merely by paying an annual sum. Such long-term leases under which there is no development impede the mining of mineral lands and are thus against public policy.

We therefore hold that an annual advance payment which is credited against future royalties under the terms of a mineral lease does not relieve the lessee of his obligation to reasonably develop the land. We further find that since the lessees in the present case have failed to carry on any sort of mining activity on the leased premises since the inception of the lease in 1960, that they have breached such duty.

*Id.* at 134.

{¶113} *Ionno* does not benefit the Landowners for several reasons. First, it is factually distinguishable. The *Ionno* Court focused on contractual language stating that the rental was *an offset* in the case of production—"an annual advance payment which is credited against future royalties"—to show that there was an implied covenant to reasonably develop. *Id.* at syllabus. The Court explained:

Clearly, we are not dealing with a contract which exacts a non-refundable annual payment of rent to the lessor as separate and independent consideration. Rather, because the minimum royalties required under the lease at hand offset production royalties, the real consideration for the lease is the expected return derived from the actual mining of the land.

*Id.* at 443.

**{¶114}** By contrast, here the rental is *not an offset but rather a substitute for drilling.* It is a non-refundable payment of rent to the Landowners as separate and independent consideration for the right to delay drilling during the primary term of the Lease.

**{¶115}** In any event, the *Ionno* implied covenant to reasonably develop will only be inferred "where a lease fails to contain any specific reference to the timeliness of development." *Id.* at 133. The *Ionno* Court specified that it was dealing with a no-term lease. There was no primary term in the *Ionno* lease during which major actions such as production were required, whereas here there is a ten-year primary term during which certain development activities must occur. Further, an implied covenant can only be construed in a lease if there are no express provisions to the contrary. *Id.* at 132-133. Where the lease specifies that no implied covenant shall be read into the agreement, an implied covenant to develop under *Ionno* cannot be imposed. *Bilbaran Farm, Inc. v. Bakerwell, Inc.*, 5th Dist. No. 12-CA-21, 2013-Ohio-2487, 993 N.E.2d 795, ¶19-21; *Bushman v. MFC Drilling, Inc.*, 9th Dist. No. 2403-M, 1995 WL 434409, *2 (July 19, 1995), *Taylor v. MFC Drilling, Inc.*, 4th Dist. No. 94CA14, 1995 WL 89710, *2 (Feb 27, 1995); *Holonko v. Collins*, 7th Dist. No. 87CA120, 1988 WL 70900, *2 (June 29, 1988), *Smith v. North East Natural Gas Co.*, 5th Dist. No. 86AP30016, 1986 WL 11337, *2-3 (Sept. 30, 1986).

**{¶116}** In *Holonko*, this court refused to impose an implied covenant of development into a lease, noting that the Supreme Court held the implied covenant is utilized only when the lease is silent as to timeliness of development. *Holonko*, 7th Dist. No. 87CA120 at *2, citing *Harris*, 57 Ohio St. at 129. This court pointed out that the lease mentioned the right of drilling or not drilling and the lease stated: "It is mutually agreed that this instrument contains and expresses *all* the agreements and understandings of the parties in regard to the subject matter thereof, *and no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them*." (Emphasis added.) *Holonko* at *2.

**{¶117}** Similarly, the Lease here contains a clause that required Beck to commence operations or make a delay rental payment, as well as a clause stating that

the rentals are "adequate and full consideration for all the rights herein granted to the Lessee, and the further right of drilling or not drilling on the leased premises * * *[;]" and a clause stating that the lease "contains and expresses all of the agreements and understandings of the parties" and that "no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them." (Lease paragraphs 3, 9, 19.)

**{¶118}** The trial court, however, found that paragraph 19's disclaimer of implied covenants was contradicted by paragraph 17 of the Lease which states:

> In the event the Lessor considers that Lessee has not complied with any of its obligations hereunder, *either expressed or implied*, Lessor shall notify Lessee in writing setting out specifically in what respects Lessee has breached this contract. Lessee shall then have thirty (30) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor. The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of thirty (30) days after service of such notice on Lessee. * * *

(Emphasis added.)

**{¶119}** The trial court concluded that the reference to express or implied in paragraph 17, which it found to be a more specific provision, created an ambiguity that nullified the disclaimer of implied covenants in paragraph 19, which the trial court found to be a more general provision.

**{¶120}** However, the fact that paragraph 17 requires *notice* of the lessor's belief that the lessee has violated an express or implied obligation does not necessarily *create* implied obligations.  The purpose of that clause is to provide notice to the lessee to ensure it has time to cure any alleged breaches.  And assuming arguendo that the clause at paragraph 17 somehow supersedes the express proscription against the creation of implied covenants in paragraph 19, the fact that

there is a delay rental provision during the primary term would preclude the reading of any implied covenants into the Lease, as discussed above.

**{¶121}** The entire premise behind the delay rental clause is to delay drilling during the primary term. As the Supreme Court has explained:

> In the lease in this case there is an express stipulation for the payment of rental in lieu of drilling, and the option is thus given the lessee to drill or pay rental in accordance with the terms of the contract. Surely the clause making such provision, which is set out in full in the finding of facts, cannot be otherwise construed or interpreted. The rights of the parties must be determined from their own contract. Under the clearly expressed terms of the lease, if the lessee does not drill, he may still continue the lease in force by payment of the stipulated rental. Such matter being covered by the express terms of the written contract, no implication can arise in relation thereto inconsistent with, or in opposition to, such plain provision of the written contract. An implied covenant can arise only when there is no expression on the subject.

*Kachelmacher v. Laird*, 92 Ohio St. 324, 332, 110 N.E. 933 (1915).

**{¶122}** For the various reasons expressed above, there is no implied covenant of reasonable development that could apply within the ten-year primary term here, as construing the lease to include such a covenant was expressly proscribed by the lease terms. The trial court erred in reading an implied covenant into the Lease and further concluding it was violated. Accordingly, Beck's second and sixth assignments of error in 12MO6 are meritorious, and Beck's third assignment of error, that the trial court erred by failing to enforce the 30-day notice provision, is moot. App.R. 12(A)(1)(c).

**{¶123}** Finally, in its fifth assignment of error in 12MO6, Beck asserts:

**{¶124}** "The trial court erred when it invoked the equitable remedy of forfeiture."

**{¶125}** Here Beck contends that—setting the other issues with the trial court's decision aside— forfeiture was not the appropriate remedy. This assignment of error

is also rendered moot by the resolution of the other assignments of error above, and we decline to address it.  App.R. 12(A)(1)(c).

### Appeal of the Denial of Intervention is Moot

{¶126}  In its sole assignment of error, XTO Energy asserts:

{¶127}  "The trial court incorrectly denied XTO Energy's Motion to Intervene."

{¶128}  In light of our decision in Case Nos. 12MO6, 13MO3, and 13MO11, XTO's appeal is moot.

> "As a general rule, courts will not resolve issues that are moot. See Miner v. Witt (1910), 82 Ohio St. 237, 92 N.E. 21. 'The doctrine of mootness is rooted both in the "case" or "controversy" language of Section 2, Article III of the United States Constitution and in the general notion of judicial restraint. * * * While Ohio has no constitutional counterpart to Section 2, Article III, the courts of Ohio have long recognized that a court cannot entertain jurisdiction over a moot question.' (Citations omitted.) James A. Keller, Inc. v. Flaherty (1991), 74 Ohio App.3d 788, 791, 600 N.E.2d 736. * * * "

In re Atty. Gen.'s Subpoena, 11th Dist. No. 2009-G-2916, 2010-Ohio-476, ¶12, quoting Nextel West Corp. v. Franklin County Bd. Of Zoning Appeals, 10th Dist. No. 03AP-625, 2004-Ohio-2943, ¶10.

{¶129}  Within its motion to intervene, XTO alleged it had a significant interest in the Leases, which the trial court determined to be void in its July 2012 decision granting summary judgment in favor of the Landowners.  Because this court has held that the Leases are valid, XTO is in the same position it held prior to the trial court's judgment.  Thus, there is no need for XTO to intervene, and as such, no case or controversy for this court to decide.

{¶130}  Accordingly, XTO's sole assignment of error in 13MO2 is moot.

## Conclusion

**{¶131}** While it was not the best practice, the trial court did not abuse its discretion by certifying the class after granting summary judgment on the merits because the rule against one-way intervention does not apply to Civ.R. 23(B)(2) classes. There was sufficient opportunity for factual development so as to permit a meaningful determination regarding the class action certification, thus rendering a hearing unnecessary. Finally, the trial court has discretion to modify the class, even sua sponte, and it did not abuse its discretion by defining the class as all Ohio lessors who executed a Form G&T 83 Lease with Beck, where Beck had neither drilled nor prepared to drill a well, nor included the property in a drilling unit. Accordingly, assignments of error 1 and 3 in 13MO3 are meritless; assignments of error 2 and 4 in 13MO3 are moot; and the sole assignment of error in 13MO11 is meritless.

**{¶132}** Regarding the summary judgment ruling, the trial court misinterpreted the pertinent lease provisions and Ohio case law and erred in concluding the Lease is a no-term, perpetual lease that is void ab initio as against public policy. The trial court further erred in concluding the Lease was subject to implied covenants and that Beck breached the implied covenant to reasonably develop. Accordingly, in 12MO6, assignments of error 1, 2, 4 and 6 are meritorious, and assignments of error 3 and 5 are moot.

**{¶133}** Finally, in light of our decision in Case Nos. 12MO6, 13MO3, and 13MO11, XTO's appeal in Case No. 13MO2 is moot.

**{¶134}** For all the foregoing reasons, the trial court's class certification and definition judgments, dated February 8, 2013 and June 10, 2013, respectively, are affirmed, and its July 31, 2012 order granting summary judgment is reversed and remanded to the trial court for further proceedings according to law and consistent with this Court's opinion.

Donofrio, J., concurs.
Vukovich, J., concurs.